**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

NORTH CHELMSFORD WATER DISTRICT,
   MASSACHUSETTS,

    ***Plaintiff*,**

       ***v.***

ELECTROMETALS, INC.;
SHAIMAS LLC;
GEARTRONICS INC.;
RICHARD L. DUFFY LIMITED PARTNERSHIP;
JUNIPER 100 CHELMSFORD LLC;
UNITED GLASS INC.;
ALTID ENTERPRISES LLC;
MASSACHUSETTS ELECTRIC COMPANY
   d/b/a NATIONAL GRID;
MCP IV, LLC;
PACE INDUSTRIES LLC;
JAPENAMELAC CORP.;
STORE MASTER FUNDING III, LLC;
NYE'S JAPENAMELAC INC.;
GENOMIC SOLUTIONS, INC.;
ESA BIOSCIENCES, INC.;
MAGELLAN BIOSCIENCES, INC.;
THERMO FISHER SCIENTIFIC INC.;
THERMO ORION INC.;
ANALOG DEVICES, INC.;
NOVA ENGINEERING;
19-21 ALPHA ROAD LLC;
CPI 21 ALPHA LLC;
ALPHA ROAD EQUITY PARTNERS LLC;
STJ ALPHA EQUITY PARTNERS LLC;
STJ 19 ALPHA EQUITY PART LLC;
ASPECT COMMUNICATIONS;
RENESAS ELECTRONICS AMERICA INC.; *and*
LINEAR TECHNOLOGY CORP.,

    ***Defendants*.**

**C.A. No. 1:26-cv-11113**

**CERCLA COMPLAINT
42 U.S.C. §§ 9607(a) and 9613(f)(1)**

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, the Plaintiff, NORTH CHELMSFORD WATER DISTRICT, MASSACHUSETTS (hereinafter "North Chelmsford" or "Plaintiff"), and for its Complaint against the Defendants ELECTROMETALS, INC.; SHAIMAS LLC; GEARTRONICS INC.; RICHARD L. DUFFY LIMITED PARTNERSHIP; JUNIPER 100 CHELMSFORD LLC; UNITED GLASS INC.; ALTID ENTERPRISES LLC; MASSACHUSETTS ELECTRIC COMPANY D/B/A NATIONAL GRID; MCP IV, LLC; PACE INDUSTRIES LLC; JAPENAMELAC CORP.; STORE MASTER FUNDING III, LLC; NYE'S JAPENAMELAC INC.; GENOMIC SOLUTIONS, INC.; ESA BIOSCIENCES, INC.; MAGELLAN BIOSCIENCES, INC.; THERMO FISHER SCIENTIFIC INC.; THERMO ORION INC.; ANALOG DEVICES, INC.; NOVA ENGINEERING; 19-21 ALPHA ROAD LLC; CPI 21 ALPHA LLC; ALPHA ROAD EQUITY PARTNERS LLC; STJ ALPHA EQUITY PARTNERS LLC; STJ 19 ALPHA EQUITY PART LLC; ASPECT COMMUNICATIONS; RENESAS ELECTRONICS AMERICA INC.; and LINEAR TECHNOLOGY CORP. (hereinafter, collectively, "Defendants"), aver and state as follows:

## INTRODUCTION

1.      Plaintiff, North Chelmsford Water District, owns and operates a public drinking water system supplying potable water to approximately 7,498 residential, commercial, and industrial customers in and around the North Chelmsford, Massachusetts.

2.      North Chelmsford's drinking water system includes one water treatment plant and six (6) groundwater wells, along with associated piping and equipment all located throughout the North Chelmsford, Middlesex County, Massachusetts.

2

3.     North Chelmsford's groundwater wells have been, and are being, contaminated by synthetic per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanesulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA"), that were purchased, consumed, transported, used, processed, mixed, stored, handled, released and/or disposed of by Defendants and/or otherwise released into the environment from Defendant's properties.

4.     PFAS are considered "emerging contaminants" because they have not been routinely monitored in the past, they have a real risk to human health, and until very recently were not regulated.

5.     PFOS, PFOA, and other types of PFAS have been detected in North Chelmsford's drinking water supply.

6.     In this civil action, North Chelmsford seeks to recover costs associated with the necessary response to contamination of its water supply wells with PFAS, including but not limited to the costs of removing these contaminants as a result of Defendants' tortious conduct and their release, remedial costs associated with long-term actions to address these releases, as well as investigation and information gathering costs, and groundwater monitoring costs.

7.     North Chelmsford further brings this action to seek, *inter alia*, available remedies under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"); to recover compensatory and all other damages and relief, including all necessary funds to compensate North Chelmsford for the costs of investigating, monitoring, evaluating, abating, and remediating the presence of PFOA and PFOS in its drinking water, including constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFOA and PFOS from public water supplies; as well as periodic sampling of groundwater; and for such other damages and relief the Court may order.

8.      Upon information and belief, defendants' facilities are located within the Plaintiff's public water supply wells zone(s) of capture and utilized materials containing PFOS, PFOA, and other types of PFAS, and other substances that transform into PFOS, PFOA, and other types of PFAS through biodegradation, in their business operations, and who either tortiously or through ordinary operations used, released, stored, handled, and/or disposed of  PFOS, PFOA, and other types of PFAS and materials containing these contaminants in such a manner that has caused PFOS, PFOA, and other types of PFAS to migrate into and exist in Plaintiff's drinking water, thereby damaging and injuring Plaintiff.

9.      Defendants, as the responsible parties, and not North Chelmsford, its taxpayers, or its customers, should bear all past, present, and future costs of addressing the above presence and removal of PFOS, PFOA, and other types of PFAS from its drinking water supply.

10.     Defendants are jointly and severally responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages to Plaintiff, as alleged, either through Defendants' own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

**JURISDICTION AND VENUE**

11.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (civil action under the laws of the United States) and 28 U.S.C. § 2201 (declaratory relief).  Jurisdiction is also proper in this Court under 42 U.S.C. § 9613(b) (the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")).  Pursuant to 28 U.S.C. § 1367(a) the Court has supplemental jurisdiction of all other claims that form part of the same case or controversy under

Article III of the United States Constitution. Plaintiff brings this civil suit, in part, pursuant to sections 42 U.S.C. §§ 9607(a) and 9613(g) of CERCLA.

12.     This Court has personal jurisdiction over Defendants by virtue of each Defendants' regular and systematic contacts with Massachusetts, including, among other things, conducting business and/or owning property in Massachusetts, and because they have the requisite minimum contacts with Massachusetts necessary to constitutionally permit the Court to exercise jurisdiction over them consistent with traditional notions of fair play and substantial justice. *See* Mass. Gen. Laws Ch. 223A, § 3.

13.     Under 28 U.S.C. § 1391(b)(2), venue is proper in this Court because a substantial part of the events giving rise to the Plaintiff's claims occurred in this judicial district, and a substantial part of property that is the subject of this action is situated in this judicial district.

## FACTUAL BACKGROUND

### A.     PFAS and Their Risk to Public Health

26.     PFAS are man-made manufactured chemical compounds containing fluorine and carbon.  The carbon-fluorine bond is one of the strongest bonds in chemistry and provides PFAS their unique chemical properties.

27.     These synthetic chemicals have been used for decades and found in a wide range of industrial, commercial, and consumer products and activities such as nonstick cookware, industrial waste disposal, pharmaceutical industry, cosmetics and beauty products, mining, plastic fabrication, and landfills and transfer stations, just to name a few.  The wide range of uses is due to their unique properties, such as their mobility, ability to reduce surface tension and use as lubricants, and resistance to heat, water, and oil.  In addition, their resistance to high temperatures and chemical reactions makes them ideal for chemical processing and manufacturing.  PFAS are also used in chemical manufacturing as surfactants and emulsifiers.

28.     According to studies, PFAS have been used in numerous applications and industries, including: adhesives; building and construction industry; cleaning products; coatings, wax, paint, varnish, and inks; electronics industry; plastic and metal etching; metal plating and finishing; packaging, paper, and cardboard; plastics, resins, and rubber; recycling and material recovery; refrigerants; scientific, general use; semiconductor industry; and textiles, among others.[1]

29.     Unlike traditional water contaminants, PFAS can cause human health impacts at incredibly small concentrations.  For example, drinking water contaminants like chloride, copper, and nitrate are tested and measured in milligrams per liter; one milligram per liter is equivalent to one part per million.  Other drinking water contaminants like lead and sodium are measured in micrograms per liter; one microgram per liter is approximately one part per billion.  PFAS are an order of magnitude smaller.  PFAS are measured in nanograms per liter ("ng/L"); one nanogram per liter ("ng/L") is approximately equivalent to one part per trillion ("ppt").  To put this in perspective, 1.0 ppt is roughly the equivalent of one drop of water in 20 Olympic-size swimming pools, or 1 second in 32,000 years.

30.     PFAS enter the environment, in part, from industrial and commercial facilities that make or use PFAS or PFAS-containing materials, use or make substances that breakdown into PFAS, make other products, through disposal, spills, releases into the environment, effluent runoff from landfills and transfer stations, and waste disposal.

31.     Due to their strong chemical bond, PFAS are resistant to degradation due to light, water, and biological processes and remain in the environment, particularly in water, for many, many years and are therefore referred to, colloquially, as "forever chemicals."

---

[1] *See, e.g.,* Linda G. T. Gaines, PhD, PE, *Historical and current usage of per- and polyfluoroalkyl substances (PFAS): A literature revie*, American Journal of Industrial Medicine, April 20022, *available at*: https://onlinelibrary.wiley.com/doi/full/10.1002/ajim.23362.

32.    Because of their unique properties PFAS are mobile and persistent in the environment.  PFAS readily contaminates soils and leach from soil into surface and groundwater, where they can travel significant distances.  PFAS therefore spread easily once released into the environment.

33.    Once PFAS enter a water supply they spread rapidly because they are water soluble, with contaminated drinking water reaching every home and a service connection's place of business.

34.    The United States Environmental Protection Agency ("EPA") has found that PFAS can be released during the manufacturing process through spills, emission vectors, and runoff, and as a component of wastewater and solid waste.[2]

35.    PFAS can leach from solid waste directly into the environment.

36.    Conventional drinking water treatment processes are ineffective at removing PFAS from the water column.

37.    PFAS bioaccumulate, meaning that they tend to accumulate in organisms.  PFAS bioaccumulate in numerous ways.  They are relatively stable once ingested, and bind to proteins and molecules in blood, tissues, and organs rather than fat like many other persistent chemicals.  These properties allow them to stay in the human body for long periods of time, and long-term exposure, such as drinking PFAS contaminated water every day, can cause significant accumulation even at low levels of exposure.  For example, in humans PFOA and PFOS remain in the body for years.  Thus, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present and only increase health risks over time.

---

[2] *See, e.g.,* EPA, *Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances – Version 2 (2024)*, April 8, 2024, *available at*: https://www.epa.gov/system/files/documents/2024-04/2024-interim-guidance-on-pfas-destruction-and-disposal.pdf.

38.     PFAS also biomagnify, meaning that their concentration in organic tissue increases as they are consumed up the food chain.

39.     PFAS are toxic and cause significant adverse effects to human health.  Human studies show associations between PFOA and PFOS levels in blood and an increased risk of several health effects, including effects on the liver, the immune system, increased risk of high blood pressure, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer.  In addition, PFOA is associated with high cholesterol, decreases in antibody responses to vaccines, high blood pressure and preeclampsia during pregnancy, and decreased birthweight.

40.     These injuries can arise months or years after exposure to PFAS.

41.     PFAS' extreme persistence in the environment and its toxicity, mobility, and bioaccumulation potential, pose significant adverse effects to human health and the environment.

42.     PFOS, PFOA, perfluoroheptanoic acid (PFHpA), perfluorohexanoic acid (PFHxA), and (PFHxS) are among the 29 contaminants now being monitored under EPA's Fifth Unregulated Contaminant Monitoring Rule ("UCMR 5"), a rule EPA promulgated under the Safe Drinking Water Act.[3]  This rule is part of a federal initiative to collect data on unregulated contaminants in public drinking water systems. The goal is to determine the prevalence, concentration, and human health impact of these contaminants and assess whether future regulation of them is necessary to protect public health.

---

[3] Final Rule, Revisions to the Unregulated Contaminated Monitoring Rule (UCMR 5) for Public Water Systems and Announcement of Public Meetings, 86 Fed. Reg. 73131 (Dec. 27, 2021).

43.     PFAS in general cause significant health impacts, such as diminished antibody responses to vaccines and reduced immune cell function leading to increased susceptibility to infections.

44.     EPA has concluded that PFOS and PFOA are likely to be carcinogenic to humans, and likely to cause hepatic, immunological, cardiovascular, and developmental effects in humans.

45.     PFHpA is suspected to cause cancer, cause endocrine disruption, accelerated puberty, cause liver and immune system damage, and linked to reduced fertility and low birth rates. Chronic exposure to PFHpA, such as consuming contaminated drinking water over an extended period, poses serious health risks.

46.     EPA has identified health risks associated with PFNA, especially through drinking water.  These include developmental effects, immune system impacts, thyroid issues, and neurodevelopmental problems.  PFNA has been used in products including cleaning and polishing products and is a breakdown of other PFAS.

47.     Research indicates exposure to PFHxS has been linked to various potential health effects, including impacts on the thyroid, affecting metabolism, development, and neurological function; liver toxicity and increased incidence of liver tumors; developmental issues, such as delayed puberty and reduced birth weight; and potential kidney damage.  PFHxS is particularly persistent in humans, with a half-life of 5-8 years.  Chronic exposure to PFHxS, such as consuming contaminated drinking water over an extended period, poses serious health risks.  PFHxS is used in water and stain coatings for consumer products like electronics and packaging.  It has been used industrially as a surface protection agent for cleaning and polishing products, and other industrial fluids and water-proofing agents.

48.    On April 10, 2024, EPA announced enforceable levels for PFOA, PFOS, and other PFAS in drinking water.  EPA set maximum containment levels (MCLs) for PFOA and PFOS at 4.0 ppt (also expressed as ng/L) under the Safe Drinking Water Act.[4]  On May 14, 2025, the Trump Administration announced that the EPA would retain drinking water standards for PFOA and PFOS and reevaluate standards EPA had set for others.[5]

49.    Effective July 9, 2024, EPA designated both PFOS and PFOA as a "hazardous substance" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.,* because EPA determined that PFOS and PFOA "may present a substantial danger to the public health or welfare or the environment when released."[6] Under CERCLA, the quantity or concentration of a hazardous substance is not a factor.

50.    The EPA has also established a list from the North American Industry Classification System ("NAICS") Codes and Standard Industrial Classification System ("SIC") Codes, based on EPA records, for entities that have a high risk for the use of PFAS.[7]  EPA uses this data in its PFAS Analytical Tools.[8]

**B.    Source Water Assessment Program Under Safe Drinking Water Act**

51.    The Source Water Assessment Program (often abbreviated "SWAP" or "SWA") is a federally-mandated drinking-water protection program created under the 1996 amendments to the Safe Drinking Water Act ("SDWA") that requires every U.S. state to evaluate where a public water

---

[4] *See* Final Rule, PFAS National Primary Drinking Water Standards, *See* 89 Fed. Reg. 32532 (April 26, 2024).

[5] *See* EPA Press Release, *EPA Announces it Will Keep Maximum Containment Levels for PFOA, PFOS* (May 14, 2025), *available at:*  https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos.

[6] Final Rule, Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed Reg. 39124 (May 8, 2024).

[7] *See, e.g.,* EPA, *Metadata for Data Sources within PFAS Analytic Tools (Public)*, July, 2022, *available at*: https://echo.epa.gov/system/files/PFASAnalyticToolsPUBLICMetadata7-13-2022.508_0.pdf.

[8] *See* EPA, PFAS Analytical Tools, *available at*:  https://echo.epa.gov/trends/pfas-tools.

system's water comes from and how vulnerable it is to contamination. Following the 1996 SDWA amendments, States developed and implemented assessment programs to identify (i) the areas that contribute water to public water system sources and (ii) the significant potential contaminant sources located within those areas, and to evaluate the susceptibility of the public water system's source water to contamination.

52.    EPA describes "SWAP" as studies or reports prepared for public water systems to generate information about significant potential contaminant sources and the potential for drinking water sources to be impacted by those sources.

53.    EPA explains that the first step in completing a "SWAP" is to delineate (map) the land area that contributes water to the drinking water supply and where pollution from human activities or natural sources poses the greatest threat to source water quality. EPA notes that this delineated area is often called a source water protection area (SWPA) or "zone of concern."

54.    EPA's source-water protection framework uses the delineated SWPA as the geographic boundary for conducting contaminant source inventory and the susceptibility analysis.

55.    For groundwater systems, the SWPA is intended to represent the surface and subsurface area that contributes recharge and/or groundwater flow to the public supply well(s) over a specified capture-zone or time-of-travel concept. In practical terms, the SWPA is the area where releases can reasonably be expected to migrate to the well(s) because groundwater within that area is hydrologically connected to the public water supply source.

56.    Many State programs also use related terms such as "wellhead protection area," "wellhead protection zones," or similar terminology. While nomenclature and delineation methods vary by State, the unifying concept is the same: the delineated contributing/capture area is identified because activities and releases within that area have the potential to affect the drinking water source.

57.     The 1986 SDWA Amendments created a State Wellhead Protection ("WHP") Program designed to protect areas surrounding public supply wells against contaminants that may adversely affect human health (SDWA § 1428; codified at 42 U.S.C. § 300h-7). EPA prepared technical guidance to assist States and local governments in delineating wellhead protection areas[9].

58.     Under SDWA § 1428(e), a "wellhead protection area" ("WHPA") is the surface and subsurface area surrounding a public water supply well or wellfield through which contaminants are reasonably likely to move toward and reach that well or wellfield.

59.     EPA's 1987 delineation guidance discusses factors relevant to setting WHPA boundaries, including (among other factors) the radius of influence around a well, drawdown, time or rate of travel of contaminants, distance from the well or wellfield, and other hydrogeologic considerations supported by pump-test data, field reconnaissance, topographic information, and local geology.

60.     Where a facility is located within the SWPA and/or WHPA delineated for a public water supply wellfield, a release of hazardous substances supports a plausible migration pathway to the public supply well(s), including through one or more of the following mechanisms:

61.     Hazardous substances released to soil, pavement, fill, shallow subsurface, or stormwater features within the delineated protection area can infiltrate through the vadose zone and

---

[9] *See* EPA Guidance for Applicants for State Wellhead Protection Program Assistance Funds Under the Safe Drinking Water Act *available at*
https://nepis.epa.gov/Exe/ZyNET.exe/9100O1DR.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1986+Thru+1990&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C86thru90%5CTxt%5C00000023%5C9100O1DR.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-
&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

leach into the underlying aquifer, particularly where soils are permeable, shallow groundwater exists, or preferential pathways (utility corridors, fractures, coarse fill) facilitate vertical migration.

62.    Once hazardous substances enter groundwater, dissolved-phase contaminants migrate with groundwater flow (advection), spread through dispersion and diffusion, and may persist or transform depending on geochemical conditions.

63.    Public supply pumping creates or enhances hydraulic gradients that draw groundwater toward the well(s), potentially capturing and transporting contaminant plumes originating within the contributing/capture area to the wellfield over time.

64.    Delineated protection areas are based on hydrogeologic information reflecting recharge and groundwater movement. A facility within the delineated area is consistent with hydrologic connectivity between releases at the facility and the public water source.

### i.    Defendants are in the Wellhead Protection Area

65.    Defendants' facilities were, at all relevant times, owned, operated, and/or controlled by Defendants as industrial and commercial facilities where hazardous substances, including PFOS, PFOA, and other types of PFAS, were used, generated, handled, stored, treated, and/or disposed of in connection with industrial, manufacturing, laboratory, semiconductor, metalworking, finishing, analytical, and related commercial operations.

66.    Accordingly, because of hydraulic connection, any release of hazardous substances at, from, or associated with Defendants' facility has a plausible pathway to migrate into Plaintiff's groundwater sources through infiltration and leaching into groundwater within the delineated protection area, followed by transport with groundwater flow and capture by pumping-induced gradients toward Plaintiff's well(s) and/or wellfield.

67.    Defendants' facilities are situated within the delineated protection area for Plaintiff's drinking-water source(s), and releases of hazardous substances from the facility migrate,

or threaten migration, into the capture zone of those source(s), thereby causing Plaintiff to incur past and ongoing investigation, monitoring, treatment, and response costs.

68.    Groundwater underlying North Chelmsford's public water supply system constitutes a hydraulically connected aquifer in which groundwater, and dissolved contaminants contained therein, migrate in accordance with hydraulic gradients created by natural recharge and municipal pumping. Once released into groundwater, PFOS, PFOA, and other types of PFAS migrate as dissolved-phase contaminants and disperse through advection, dispersion, and diffusion, resulting in commingled contaminant plumes that cannot be traced to any single source with precision.

69.    Accordingly, the releases of PFOS, PFOA, and other types of PFAS from Defendants' respective facilities have contributed to a commingled plume of contamination within Plaintiff's groundwater supply, and such releases have caused and continue to cause a single, indivisible injury to Plaintiff's property and water supply.

> ii.    Release, Migration, and Contamination of North Chelmsford's Groundwater and Public Drinking Water Supply with PFOS, PFOA, and Other PFAS

70.    North Chelmsford is responsible for providing safe and reliable drinking water to approximately 7,498 full-time residents.[10]

71.    North Chelmsford is a municipal/public water supplier and "person" within the meaning of CERCLA § 9601(21).

72.    North Chelmsford draws its drinking water from the Merrimack River Basin aquifer system, which is recharged by Cold Spring Brook and Stony Brook. The system receives their

---

[10] As of 2020 Census according to Village of Hempstead 2024 Annual Water Qualify Report, *available at*: https://www.villageofhempstead.org/DocumentCenter/View/15707/-WATER-QAULITY-REPORT-2024

water from four groundwater gravel-packed wells and two Bed Rock Wells, known as the Bomil Well Field that are connected to a water filtration plant. The aquifer is replenished by rainfall that infiltrates and percolates through the ground.

73.    The Merrimack River Basin aquifer features high hydraulic conductivity, enabling contaminants to spread rapidly.  North Chelmsford's wells are in an aquifer with a high vulnerability to contamination due to the absence of hydrogeologic barriers (i.e. clay) that can prevent contaminant migration.

74.    The Merrimack River Basin aquifer constitutes the principal source of drinking water for numerous municipalities in Massachusetts, including communities in Middlesex County, such as North Chelmsford. These groundwater systems consist primarily of stratified-drift aquifers hydraulically connected to surface waters within the river basins and supply public water systems that rely predominantly on groundwater withdrawals. The Massachusetts Department of Environmental Protection ("MassDEP") has recognized that these basin aquifers are critical public drinking water resources and has identified their protection as essential to safeguarding public health, particularly where communities rely on groundwater as their primary source of potable water.

75.    As both EPA and MassDEP have acknowledged, contamination of groundwater aquifers can be difficult or impossible to remediate once it occurs. Accordingly, contamination of the Merrimack River Basin aquifer would pose a significant hazard to the public health of the population dependent on this groundwater resource for drinking water.

76.    These aquifers are particularly susceptible to contamination due to the region's sandy, highly permeable soils and shallow water tables. This facilitates the infiltration and migration of PFOS, PFOA, and other types of PFAS contamination.

77.     Groundwater is extracted from North Chelmsford's six drilled wells and conveyed to one treatment plant for treatment and conditioning prior to being pumped into North Chelmsford's public water distribution system for potable use.

78.     North Chelmsford regularly conducts extensive drinking water monitoring. The North Chelmsford's 2024 Consumer Confidence Report, documents routine laboratory analyses for a wide range of regulated contaminants and water quality parameters in accordance with Safe Drinking Water Act requirements.

79.     North Chelmsford has participated in EPA's Unregulated Contaminate Monitoring Rule testing for many years.

80.     Water quality testing mandated by the State of Massachusetts and the EPA, and conducted pursuant to required methodologies shows North Chelmsford has elevated levels of PFOS, PFOA, PFHpA, PFHxA, and PFHxS in its drinking water.  North Chelmsford collected water samples and tested for contaminants in accordance with EPA's UCMR.  The following are some of the results, all expressed in parts per trillion:

| Water Source Name | Highest PFOA Concentration | Highest PFOS Concentration | Highest Other PFAS Analyte Description | Highest Other PFAS Analyte Concentration |
|---|---|---|---|---|
| 01G Bomil Well 1 | 8.49 | 3.88 | PFHxA | 4.71 |
| 02G Bomil Well 2 | 13.5 | 6.46 | PFBS | 2 |
| 03GP Bomil Well 3A | 8.73 | 11.2 | PFHxA | 4.15 |
| 04G Bomil Well 4 | 8.37 | 5.47 | PFHxA | 4.24 |
| 05G Bedrock Well 1 | 6.51 | 4.01 | PFHxA | 2.84 |
| 06G Bedrock Well 2 | 3.16 | 2.03 | PFBS | 0.98 |

81.     Because its drinking water is contaminated with hazardous substances, and because they exceed EPA's drinking water standards for PFOS and PFOA, North Chelmsford built special filtration to remove these PFAS since traditional water treatment technologies do not.

82.     Moreover, because its wells are contaminated with PFOS, PFOA, and other types of PFAS, North Chelmsford faces the substantial and costly burden of installing treatment systems to remove PFAS from its groundwater supply. Due to the chemical stability and persistence of PFOS, PFOA, and other types of PFAS, conventional treatment processes are ineffective at adequately reducing PFOS, PFOA, and other types of PFAS concentrations. Granular activated carbon ("GAC") filtration is a proven and widely accepted technology for PFOS, PFOA, and other types of PFAS removal from drinking water, particularly for long-chain PFAS compounds, such as PFOS and PFOA. As a result, North Chelmsford was required to implement GAC-based treatment system to address PFOS, PFOA, and other types of PFAS contamination in its public water supply.

83.     Thus, North Chelmsford will be forced to continue implementing extraordinary and costly measures to continue combating the contamination and to keep water potable.

84.     Since the installation of its GAC filtration system in 2021, North Chelmsford has continuously operated the system to remove PFOS, PFOA, and other PFAS compounds from its groundwater supply. Chelmsford's is required to periodically monitor PFAS concentrations, replace exhausted GAC media, and incur ongoing operational, maintenance, sampling, laboratory, and compliance costs in order to maintain regulatory compliance and protect public health. These response actions are continuing in nature and are necessitated by the ongoing presence and migration of PFAS contamination within the North Chelmsford's water sources.

85. The Defendants knew, or should have known, that PFOS, PFOA, and other types of PFAS, and their degradation products and ingredients, create a substantial risk of harm to groundwater and members of the public who consume such groundwater.

86. Defendants knew or should have known, that the PFOS, PFOA, and other types of PFAS-containing products they were purchasing, transporting, using, processing, mixing, storing, handling and/or disposing create a substantial risk of harm of contaminating the ground, soil, groundwater, the aquifers, and to members of the public whose water supply originates with the groundwater, therefore, Plaintiff's Water Source.

87. Defendants negligently distributed, stored, transported, and/or disposed of, or willfully, wantonly, and intentionally spilled, disposed of, or otherwise permitted the release of PFOS, PFOA, and other types of PFAS from their properties as to cause severe contamination of ground, soil, groundwater, and/or aquifer, and/or said Defendants own or owned the properties upon which such actions and/or results occurred.

88. As to ordinary use and disposal, PFOS, PFOA, and other types of PFAS were widely used for decades in industrial, commercial, and wastewater-related activities and were routinely released into the environment through industrial discharges, wastewater treatment systems, stormwater, landfills, and other disposal pathways. These ordinary uses and releases led to PFAS contamination of groundwater resources within the Merrimack River Basin, from which North Chelmsford draws its drinking water. Because PFOS, PFOA, and other types of PFAS are highly persistent and mobile in groundwater, this contamination has required North Chelmsford to install GAC treatment systems to remove PFAS from its public water supply.

89. Regardless of the dates of installation, to the extent a sewer system has been utilized at the Site, such system functioned as an additional release mechanism. Because sanitary sewers

are not designed or maintained to be leak-proof, hazardous substances migrate into the subsurface via exfiltration through pipe joints, cracks, or other structural failures, resulting in ongoing releases to the environment, and ultimately into the Plaintiff's water supplies.

90.     Plaintiff is operating a public water system and has a duty to exercise due care and diligence in the maintenance and supervision of all sources of the public water systems to prevent its pollution and depletion, pursuant to 310 CMR 22.22.

91.     Plaintiff operates a public water system and as a supplier of water has a duty to take the necessary steps to ensure the protection of the public health, including the undertaking of remedial feasibility studies and the installation of a suitable treatment process, pursuant to 310 CMR 22.05(1)(d); 310 CMR 22.21(1)(b).

92.     As a direct result of Defendants' careless and negligent acts and omissions PFOS, PFOA, and other types of PFAS percolated the soil and reached the aquifer from which Plaintiff draws potable water to supply its customers.

93.     As a direct result of Defendants' acts and omissions, which are the sole and direct cause of Plaintiff's injuries, Plaintiff's wells have become contaminated from the release and/or releases of Defendants' toxic and hazardous substances thereby rendering the aquifer from which Plaintiff draws it potable water unusable without extensive and expensive treatment.

94.     North Chelmsford's damages, caused by the above contamination, include, but are not limited to, investigation costs, testing and monitoring costs, costs of planning, design and installation of water treatment systems, treatment, operating and maintenance costs for many years, infrastructure modifications, engineering fees and other related costs, all to protect its citizens from the harms of PFOS, PFOA, and other types of PFAS.

C.    **Defendants' Industrial Activities Are Associated with PFAS Use and Release**

95.    Upon information and belief, PFOS, PFOA, and other types of PFAS discharged from Defendants' facilities have migrated to Plaintiff's Water Sources. This allegation is supported by the fact that each facility is located within the zone of capture for Plaintiff's public supply wells and is associated with NAICS or SIC codes identified by the EPA as high-risk for PFAS use; consequently, the hydrological flow and the proximity of these facilities provide a direct pathway for the transport of PFOS, PFOA, and other types of PFAS to Plaintiff's water supply.

96.    Contamination from industrial and commercial operations, like those of the Defendants, can significantly impact groundwater used for Plaintiff's drinking water supplies.

97.    All of the above pathways have been found to be significant migration patterns for PFAS compounds.

98.    The extreme stability of PFOS, PFOA, and other types of PFAS compounds means that natural systems that might filter out or mitigate the migration of other contaminants are not as effective for PFOS, PFOA, and other types of PFAS compounds, the same is true for traditional wastewater treatment plants.

99.    Significantly, the very low threshold for PFOS, PFOA, and other types of PFAS compounds in drinking water, which is several of orders magnitude smaller than many other contaminants, means that even a *de minimis* amount of PFOS, PFOA, and other types of PFAS can have a big impact on a drinking water supply.

100.    As a result of Defendants' tortious actions, omissions, and conduct in the use, release, storage, handling, and/or disposal of PFOS, PFOA, and other types of PFAS and PFOS, PFOA, and other types of PFAS-containing materials at, near, or within the vicinity of the source water protection area for Plaintiff's Water Sources, PFOS, PFOA, and other types of PFAS have

been caused to migrate into and exist in Plaintiffs' Water Source and property, thereby damaging and injuring Plaintiff.

101.    Upon information and belief, the Defendants are responsible, negligently, intentionally and/or in some actionable manner, jointly and severally, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiff, as alleged, either through Defendants' own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

## THE PARTIES

### Plaintiff

102.    **Plaintiff,    NORTH    CHELMSFORD    WATER    DISTRICT, MASSACHUSETTS,** is a Massachusetts political subdivision with its principal place of business at 64 Washington Street, North Chelmsford MA 01824.   North Chelmsford owns, manages, operates, and controls its water supply system, including maintenance and improvements of three water treatment plants and its twenty public water supply wells.

103.    At all relevant times herein, North Chelmsford owned and operated and has been charged with the responsibility of delivering safe, reliable, and high-quality drinking water that meets state and federal standards for residents and businesses of North Chelmsford.

104.    At all relevant times herein, the sources of water utilized by North Chelmsford to provide drinking water to the residents and businesses is groundwater drawn from the underground the Merrimack River Basin aquifers via six (6) groundwater wells ("Plaintiff's Water Source").

105.    The groundwater aquifers within the Merrimack River Basin serve as the principal sources of drinking water for numerous municipalities in Massachusetts, including North

Chelmsford. This aquifer is a critical public water resource, and contamination events affecting it would pose a significant hazard to public health due to the communities' substantial reliance on groundwater supplies and the limited availability of readily accessible alternative drinking water sources.

**Defendants**

106.    Defendants are current and/or former owners and/or operators of properties within the source water protection area of Plaintiff's drinking water supply wells.

107.    PFOS, PFOA, and other types of PFAS and PFOS, PFOA and other types of PFAS-containing products were disposed, spilled, discharged, or otherwise released into the environment, including the groundwater, at various sites within Plaintiff's source water protection area, including at the properties operated and/or owned by the Defendants.

108.    At all times relevant to this litigation, Defendants did business in Massachusetts as suppliers, consumers, users, handlers and/ or disposers of PFOS, PFOA, and other types of PFAS-containing products at their facilities and/or properties and/or said Defendants own or owned the properties upon which such actions and/or results occurred and from which PFOS, PFOA, and other types of PFAS was permitted to migrate and impact Plaintiff's wells.

109.    At all times relevant to this litigation, Defendants disposed, spilled, discharged, or otherwise released PFOS, PFOA, and other types of PFAS at their facilities and/or properties and/or said Defendants own or owned the properties at the time that such actions and/or results occurred, such that each Defendant knew or should have known that PFOS, PFOA, and other types of PFAS would be released into the soil and groundwater and contaminate areas containing Plaintiff's drinking water supply wells.

110.    As a direct result of Defendants' careless and negligent acts and omissions, PFOS, PFOA, and other types of PFAS entered the soil and groundwater at their facilities and/or

properties and contaminated the aquifer from which Plaintiff draws potable water to supply its customers.

111.    As a direct result of Defendants' acts and omissions, which are the sole and direct cause of Plaintiff's injuries, Plaintiff's wells have become contaminated with PFOS, PFOA, and other types of PFAS, causing damages to Plaintiff's property and requiring Plaintiff to incur costs, as described above.

112.    Defendants' wrongful actions and omissions, which are contributing to the presence of PFOS, PFOA, and other types of PFAS in Plaintiff's wells, are continuing and ongoing.

113.    Any and all references to a Defendant or Defendants in this Complaint include any and all predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

114.    When the term "Defendants" is used alone, it refers to all Defendants named herein jointly and severally.

115.    When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

116.    Upon information and belief, each of the Defendants is responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and has caused and continues to cause injuries and damages to Plaintiff, either through the defendant's own conduct or through the conduct of its agents, servants or employees, or due to the

ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

### A. Defendants at 275 Billerica Road, Chelmsford, MA

117.    The property located at 275 Billerica Road has been used for industrial and manufacturing operations since at least the 1960s, including metal fabrication, machining, surface treatment, and related activities conducted by Electrometals, Inc. These operations involved the use, handling, storage, and disposal of industrial chemicals, coatings, solvents, and related hazardous substances.

118.    Environmental investigations conducted at and in connection with 275 Billerica Road have documented releases of hazardous substances and confirmed the presence of PFAS contamination in groundwater, including detections of PFOA, PFOS, and additional PFAS compounds at reportable concentrations in multiple monitoring wells between 2024 and 2025, demonstrating releases of hazardous substances associated with historical industrial operations at the facility.

119.    MassDEP and EPA regulatory records further identify the property as a hazardous waste site with assigned Release Tracking Numbers ("RTN") and documented releases of hazardous substances associated with historical industrial operations. Environmental investigations have also identified contaminant plumes migrating through subsurface materials and groundwater, demonstrating pathways for contaminant transport.

120.    Under MassDEP regulations, public water supply wells are protected through the establishment of Zone I, Zone II, and Interim Wellhead Protection Areas ("IWPA"), which delineate groundwater recharge and capture areas contributing flow to public drinking water wells. Hazardous substances released within these areas can migrate through groundwater and enter

public drinking water supplies, creating a direct hydrological pathway between contaminant releases and public water supply wells.

121.    The property located at 275 Billerica Road is within the water protection area, capture zone, and wellhead protection area of public drinking water supply wells owned and operated by North Chelmsford, and groundwater beneath the property flows toward and contributes to North Chelmsford's municipal drinking water sources.

122.    **Defendant ELECTROMETALS, INC.** owned and operated an industrial facility at 275 Billerica Road during at least the late 1960s through the early 2000s.

123.    During its ownership and operation at 275 Billerica Road, Electrometals Inc. engaged in metal fabrication, dichromate treatment, alkaline rinsing, and spray-painting processes that involved the use, storage, handling, and disposal of hazardous substances, including solvents, chromium compounds, and other industrial chemicals.

124.    These operations involved the use, handling, storage, and disposal of industrial chemicals, including fluorinated surfactants, coatings, and process aids commonly used in metal finishing and dichromate treatment operations during the relevant time period, which historically contained PFOS, PFOA, and other types of PFAS and/or degraded, transformed, or otherwise broke down into PFOS, PFOA, and other types of PFAS[11].

125.    MassDEP and EPA regulatory records identify Electrometals, Inc. as a hazardous waste generator and operator at the facility located at 275 Billerica Road during the period in which Electrometals, Inc. owned and/or operated the Site, and MassDEP assigned RTN, including 3-0050848 and 3-0000290, in connection with releases of hazardous substances associated with Electrometals, Inc.'s operations.

---

[11] *Id.*

126. Regulatory records reflect that discovery and preliminary assessment activities for Electrometals, Inc. occurred beginning in or about November 1980, with subsequent state-oversight cleanup actions beginning by at least July 18, 2000.

127. MassDEP records identify Electrometals, Inc. as a reportable release location under Massachusetts General Laws Chapter 21E, with RTN 3-0050848.

128. Environmental investigations at 275 Billerica Road identified a plume of dissolved-phase chlorinated volatile organic compounds ("CVOCs") migrating eastward, with the plume axis located near the midpoint of the eastern boundary of the property.

129. Groundwater sampling conducted at monitoring well GEO-13S at the 275 Billerica Road facility, during the period in which Electrometals, Inc. owned and/or operated the Site, on or about August 17, 2002, and September 5, 2002, detected trichloroethylene ("TCE") at a concentration of approximately 4 μg/L, with samples analyzed using EPA Method 8260B for volatile organic compounds.

130. The CVOC plume is located within overburden materials and appears to follow a shallow depression in the underlying bedrock surface, demonstrating migration of contaminants in groundwater.

131. Groundwater sampling conducted between April 2024 and June 2025 at the 275 Billerica Road facility, detected PFAS contamination at reportable levels in multiple monitoring wells, including PFOS and PFOA, as well as numerous additional PFAS compounds. PFOA was detected in 15 of 17 wells at concentrations up to approximately 85 ng/L, and PFOS was detected in 9 of 17 wells at concentrations up to approximately 16 ng/L. Sampling further confirmed the presence of additional PFAS compounds, including perfluorobutanoic acid (PFBA), perfluoropentanoic acid (PFPeA), perfluorohexanoic acid (PFHxA), perfluoroheptanoic acid

(PFHpA), perfluorononanoic acid (PFNA), perfluorobutanesulfonic acid (PFBS), perfluorohexanesulfonic acid (PFHxS), perfluorooctanesulfonamide (PFOSA), and perfluoro-1-butanesulfonamide (FBSA), with total PFAS concentrations detected at levels up to approximately 95 ng/L.

132.    At all relevant times, Defendant Electrometals, Inc. owned and/or operated the facility at times when hazardous substances, including PFOS, PFOA and other types of PFAS, were generated, handled, disposed of, or released in violation of environmental laws and is responsible for contamination originating from its operations.

133.    As a direct and proximate result of Defendant's operations at this facility, PFOS, PFOA, and other types of PFAS were released at 275 Billerica Road.

134.    PFOS, PFOA, and other PFAS released at or from 275 Billerica Road have migrated and continue to migrate through soil, subsurface materials, and groundwater, and have entered and continue to enter aquifers within North Chelmsford's water protection areas, including groundwater supplying municipal drinking water wells operated by North Chelmsford.

135.    As a direct and proximate result of Defendant Electrometals, Inc.'s operations at 275 Billerica Road, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

136.    **Defendant SHAIMAS LLC** is a commercial real estate ownership and management entity and is the current owner of the property located at 275 Billerica Road, Chelmsford, Massachusetts, having acquired title to the Site in or about April 2009, and has since owned, managed, leased, and exercised authority and control over the property and its commercial and industrial use.

137.    Hazardous substances, including PFOS, PFOA, and other PFAS, were present at 275 Billerica Road at the time Shaimas LLC acquired ownership and remain present in soil, subsurface materials, and groundwater, where they continue to leach, migrate, and discharge into surrounding soils and groundwater and enter aquifers within North Chelmsford's wellhead protection areas that supplies its public drinking water wells.

138.    As a direct and proximate result of the above, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

139.    Shaimas LLC acquired title to the Property at 275 Billerica Road after hazardous substances had been released and/or disposed of at the site and owned the Property during the time hazardous substances have been present in environmental media and have continued to migrate off-site.

140.    As the current owner of 275 Billerica Road, Shaimas LLC is liable under CERCLA §107(a)(1).

**B.    Defendant at 100 Chelmsford Road, North Billerica, MA**

141.    The property at 100 Chelmsford Road, North Billerica, MA (the "100 Chelmsford Road Property") has been used for industrial manufacturing operations since at least 1962, including precision machining, gear manufacturing, and electromechanical assembly conducted by Geartronics Inc. and related operators. These operations involved the use, handling, storage, and disposal of industrial chemicals, including metalworking fluids, cutting oils, degreasers, coatings, corrosion inhibitors, and related process chemicals historically associated with PFOS, PFOA, and other types of PFAS.

142.    Environmental investigations confirmed the presence of PFAS contamination in groundwater at the property. Groundwater sampling conducted on or about July 1, 2025 detected

28

PFAS compounds, including PFOA, PFOS, PFHxS, PFNA, PFHpA, and PFDA, at concentrations exceeding reportable limits established by the Massachusetts Department of Environmental Protection, confirming the release of hazardous substances to soil and groundwater at and from the facility.

143.    Under MassDEP regulations, public water supply wells are protected through the establishment of Zone I, Zone II, and IWPA, which delineate groundwater recharge and capture areas contributing flow to public drinking water wells. Hazardous substances released within these areas can migrate through groundwater and enter public drinking water supplies, creating a direct hydrological pathway between contaminant releases and public water supply wells. Regulatory records further identify the property as a hazardous waste generating industrial facility subject to environmental notification, compliance, and oversight, including hazardous waste and air quality regulatory programs.

144.    The property located at 100 Chelmsford Road is within the water protection area, capture zone, and wellhead protection area of public drinking water supply wells owned and operated by North Chelmsford, and groundwater beneath 100 Chelmsford Road flows toward and contributes to North Chelmsford's municipal drinking water sources.

145.    **Defendant GEARTRONICS INC.** owns and/or operates a facility located at 100 Chelmsford Road, North Billerica, Massachusetts and used the property for commercial and industrial purposes since 1962.

146.    Defendant Geartronics Inc. owned and/or operated the facility located at 100 Chelmsford Road, North Billerica, Massachusetts, where it conducted manufacturing operations specializing in precision-machined components, custom gears, and electromechanical assemblies for the aerospace, defense, and industrial sectors.

147.    Regulatory records identify the facility at 100 Chelmsford Road as subject to air quality notification requirements and hazardous waste notification filings with MassDEP.

148.    Regulatory records further reflect that the facility was the subject of a 1991 Compliance Evaluation and related enforcement documentation, including an Order of Dismissal.

149.    During its operations at 100 Chelmsford Road, Defendant Geartronics generated and managed regulated hazardous wastes and conducted activities requiring environmental notification and compliance oversight.

150.    Industrial and equipment-related operations of the type conducted at 100 Chelmsford Road commonly involve the use of solvents, degreasers, lubricants, coatings, and process aids, including materials that historically contained or were formulated with PFOS, PFOA and other types of PFAS.

151.    On or about July 1, 2025, groundwater sampling at 100 Chelmsford Road detected PFAS substances at concentrations exceeding reportable limits established by the MassDEP. Specifically, PFOA, PFOS, PFHxS, PFNA, PFHpA, PFDA, collectively referred to as PFAS-6, were detected at a concentration of 13.3 parts per trillion ("ppt") in groundwater at the property, constituting a release of hazardous substances into the environment.

152.    Defendant Geartronics Inc.'s precision machining, gear manufacturing, and electromechanical assembly operations at the facility located at 100 Chelmsford Road involved the use, handling, storage, and disposal of industrial chemicals and process materials, including metalworking fluids, cutting oils, degreasing agents, coatings, corrosion inhibitors, and related process chemicals that historically contained and/or degraded into PFOS, PFOA, and other types

of PFAS, and such operations created pathways for the release of PFOS, PFOA, and other PFAS into soil, subsurface materials, and groundwater.[12]

153.    PFOS, PFOA and other types of PFAS-containing materials were released from the 100 Chelmsford Road facility through routine industrial practices, including but not limited to handling losses, equipment cleaning, floor drains, wastewater systems, stormwater pathways, and/or waste management practices.

154.    At all relevant times, Defendant Geartronics Inc. exercised authority and control over operations and waste-management practices at 100 Chelmsford Road and is responsible for contamination originating from its operations.

155.    PFOS, PFOA, and other types of PFAS released at or from 100 Chelmsford Road migrated through soil and groundwater and contributed to contamination impacting municipal drinking water sources serving North Chelmsford.

156.    As a direct and proximate result of Defendant Geartronics Inc.'s operations at the Site, PFOS, PFOA, and other PFAS migrated through groundwater and entered aquifers supplying North Chelmsford's public drinking water wells.

157.    As a direct and proximate result of Defendant Geartronics Inc.'s operations at 100 Chelmsford Road, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

158.    **Defendant RICHARD L. DUFFY LIMITED PARTNERSHIP** owned the property located at 100 Chelmsford Road, North Billerica, Massachusetts during periods in which hazardous substances were released at or from the property.

---

[12] *Id.*

159.    Regulatory records maintained by MassDEP, including RTN 3-52427, identify Richard L. Duffy Limited Partnership as a Potentially Responsible Party ("PRP") and as the owner of the property located at 100 Chelmsford Road, Billerica, Massachusetts at the time of the reported release of PFAS to soil and/or groundwater.

160.    MassDEP regulatory records for RTN 3-52427 identify Richard L. Duffy Limited Partnership as a PRP and as the property owner associated with 100 Chelmsford Road at the time of the September 2025 PFAS release notification.

161.    At all relevant times, the property was used for commercial and industrial purposes involving the handling and disposal of hazardous substances by facility operators, including Geartronics Inc.

162.    Hazardous substances, including PFOS, PFOA, and other types of PFAS, were released at or from the property during periods of ownership by Richard L. Duffy Limited Partnership.

163.    At all relevant times, Richard L. Duffy Limited Partnership owned the property and is liable as the owner of a facility from which hazardous substances were released.

164.    Hazardous substances, including PFOS, PFOA, and other types of PFAS released at or from the facility located at 100 Chelmsford Road during Richard L. Duffy Limited Partnership's ownership, entered soil and subsurface materials and migrated through groundwater, where such substances continue to leach, discharge, and migrate into aquifers within North Chelmsford's water protection areas, and have impacted and continue to impact municipal drinking water wells operated by North Chelmsford.

165.    As a direct and proximate result of the release and continued migration of PFOS, PFOA, and other PFAS from the facility, North Chelmsford has incurred and will continue to incur

response costs, including costs associated with investigation, monitoring, sampling, treatment, remediation, engineering evaluation, operation and maintenance of treatment systems, and other actions necessary to address the PFOS, PFOA, and other PFAS contamination affecting its public drinking water supply.

166.    As former owner of a facility from which hazardous substances were released and continue to be released, Richard L. Duffy Limited Partnership is liable under CERCLA §107(a)(2).

167.    **Defendant JUNIPER 100 CHELMSFORD LLC ("Juniper 100")** is a limited liability corporation organized and existing under the laws of Massachusetts dedicated to acquire, own, operate, finance, redevelop, improve, lease, sell and otherwise deal with, directly or indirectly, any real estate, and currently owns the site at 100 Chelmsford Road, North Billerica, Massachusetts.

168.    Juniper 100 is the current owner of the land and building located at 100 Chelmsford Road since October 2025, and holds authority and control over the premises, including leasing, maintenance, and property management.

169.    Upon information and belief, PFOS, PFOA, and other PFAS were released at 100 Chelmsford Road through historical and ongoing industrial, manufacturing, laboratory, and utility operations conducted at the property, including releases through septic systems, industrial wastewater disposal, floor drains, stormwater infrastructure, transformer equipment failures, and other disposal and migration pathways.

170.    Upon information and belief, PFOS, PFOA, and other types of PFAS released at 100 Chelmsford Road have migrated and continue to migrate through soil, subsurface materials, and groundwater, and have North Chelmsford's drinking water supply wells and drinking water sources.

171.    Juniper 100 acquired title to the Property after hazardous substances had been released and/or disposed of at the site and has owned the Property during the time hazardous substances have been present in environmental media and have continued to migrate off-site.

172.    As a direct and proximate result of the above, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA, and other types of PFAS contamination.

173.    As current owner of a facility from which hazardous substances were released and continue to be released, Juniper 100 is liable under CERCLA §107(a)(1).

**C.    Defendants at 187 Billerica Road, Chelmsford, MA**

174.    The property located at 187 Billerica Road, Chelmsford, Massachusetts was developed with a multi-tenant industrial and commercial building constructed in or about 1974–1975 and has since been used for warehouse, laboratory, manufacturing, and industrial operations involving the use of hazardous substances.

175.    Since approximately 1975, multiple commercial and industrial tenants have operated at the facility, including United Glass Inc., which conducted glass manufacturing and industrial processing operations involving the use of industrial chemicals, solvents, and wastewater-generating processes, and operations involving hazardous substances.

176.    Regulatory records maintained by the MassDEP identify 187 Billerica Road as a location where releases of hazardous substances occurred, including the discharge of industrial wastewater to the on-site septic disposal system by United Glass Inc. in or about 1986, resulting in contamination of environmental media. MassDEP assigned RTN 3-0000910 to 187 Billerica Road and conducted site investigation and regulatory oversight in connection with such releases.

177.    Environmental investigations conducted at 187 Billerica Road identified hazardous substances in the on-site septic system and confirmed the potential for migration of contaminants to groundwater.

178.    Under MassDEP regulations, public water supply wells are protected through the establishment of Zone I, Zone II, and IWPA, which delineate groundwater recharge and capture areas contributing flow to public drinking water wells. Hazardous substances released within these areas can migrate through groundwater and enter public drinking water supplies, creating a direct hydrological pathway between contaminant releases and public water supply wells.

179.    187 Billerica Road is located within the water protection area, capture zone, and Zone II wellhead protection area of public drinking water supply wells owned and operated by North Chelmsford, and groundwater beneath the 187 Billerica Road flows toward and contributes to municipal drinking water sources.

180.    **Defendant UNITED GLASS INC.** owned and/or operated commercial glass manufacturing and construction facility since on or around 1975, located at 187 Billerica Road, Chelmsford, Massachusetts, where it engaged in industrial operations involving the use, handling, storage, treatment, and disposal of hazardous substances. Public records, historical directories, regulatory files, and/or site investigation materials identify Defendant as a past operator of the Facility, although the exact operational dates are not yet known.

181.    United Glass Inc. used hazardous substances in its manufacturing processes, including nitric acid, hydrochloric acid, methanol, ferric chloride, solvents, and related industrial chemicals.

182.    Glass manufacturing and industrial processing operations of the type conducted at 187 Billerica Road historically involved the use of fluorinated surfactants, mold release agents,

coatings, degreasing agents, and related industrial chemicals, which have been widely documented to contain PFOS, PFOA, and other types of PFAS, and which were used to improve surface wetting, reduce surface tension, prevent adhesion, and enhance industrial manufacturing and equipment maintenance processes.[13]

183.    On November 26, 1986, the MassDEP documented an unpermitted discharge of industrial wastewater from United Glass Inc.'s operations into an on-site septic system, resulting in the release of hazardous substances directly into soil and groundwater at 187 Billerica Road.

184.    In response to the unpermitted discharge of industrial wastewater from United Glass Inc.'s operations at 187 Billerica Road, the Massachusetts Department of Environmental Protection ("MassDEP") assigned RTN 3-0000910 to the Site under the Massachusetts Contingency Plan, M.G.L. c. 21E, and initiated site investigation and regulatory oversight activities beginning in or about 1987, confirming the release of hazardous substances to soil and groundwater originating from United Glass Inc.'s industrial operations.

185.    Environmental investigations confirmed that hazardous substances released from United Glass Inc.'s operations at 187 Billerica Road migrated into soil and groundwater, and downgradient of the site.

186.    At the time of United Glass Inc.'s operations, PFAS were not routinely monitored or regulated, and historical environmental investigations did not test for PFOS, PFOA, and other PFAS, despite their use in industrial operations and ability to migrate in groundwater and contaminate drinking water sources.

---

[13] Interstate Technology & Regulatory Council, *PFAS: Per- and Polyfluoroalkyl Substances*, § 2.5 PFAS Uses and Products, https://pfas-1.itrcweb.org/uses-and-products/ (last visited Feb. 17, 2026) (describing widespread industrial use of PFAS in coatings, electrical equipment, metal finishing, and manufacturing applications).

187.    Upon information and belief, through its ownership and/or operation of industrial activities at 187 Billerica Road, United Glass Inc. caused and/or contributed to releases of hazardous substances, including PFOS, PFOA, and other types of PFAS.

188.    Upon information and belief, PFOS, PFOA, and other types of PFAS released from United Glass Inc.'s operations migrated through soil and groundwater from 187 Billerica Road and entered groundwater contributing to North Chelmsford's public drinking water supply wells, including multiple municipal wells located downgradient and within the water protection area affected by releases from the site.

189.    As a direct and proximate result of Defendant United Glass Inc.'s operations at 187 Billerica Road, Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

190.    **Defendant ALTID ENTERPRISES LLC**, a property management company owned and/or controlled the property located at 187 Billerica Road during periods when hazardous substances were released. Public records, historical directories, regulatory files, and/or site investigation materials identify Defendant as a past operator of the Facility, although the exact operational dates are not yet known.

191.    Upon information and belief, Altid owned/managed the Property and/or owned/controlled United Glass at all relevant times during industrial operations at 187 Billerica Road involving hazardous substances, including materials containing PFOS, PFOA, and other types of PFAS.

192.    Through its ownership and control of United Glass Inc., Altid Enterprises caused and/or contributed to releases of hazardous substances into soil and groundwater at the facility.

193.    Upon information and belief, United Glass Inc.'s industrial operations at 187 Billerica Road involved the use, handling, storage, and disposal of hazardous substances, including PFOS, PFOA, and other types of PFAS, which were released into soil and groundwater during the period of Altid Enterprises' ownership and control.

194.    Upon information and belief, PFOS, PFOA, and other PFAS released from United Glass Inc.'s operations migrated through soil and groundwater and entered groundwater contributing to North Chelmsford's public drinking water supply wells.

195.    Upon information and belief, PFOS, PFOA, and other PFAS released from Altid Enterprises' operations migrated through soil and groundwater and entered groundwater contributing to North Chelmsford's public drinking water wells.

196.    As a direct and proximate result of releases of hazardous substances from operations conducted by United Glass Inc. under the ownership and/or control of Altid Enterprises, Plaintiff has incurred and will continue to incur response costs, investigation costs, remediation costs, and other.

197.    As current and/or former owner of a facility from which hazardous substances were released and continue to be released, Defendant Altid Enterprises is liable under CERCLA §107(a)(1) and §107(a)(2).

198.    **Defendant MASSACHUSETTS ELECTRIC COMPANY d/b/a NATIONAL GRID ("National Grid")** is, and at all relevant times was, a corporation authorized to do business in the Commonwealth of Massachusetts, and owned, operated, maintained, and/or controlled electrical transmission and distribution infrastructure, including pad-mounted electrical transformers, throughout North Chelmsford, Massachusetts, including at 187 Billerica Road.

199.    At all relevant times, National Grid owned, operated, maintained, and/or controlled a 750 kVA pad-mounted electrical transformer and other materials and equipment located at the Site, which was used in connection with the distribution of electrical power to industrial and commercial operations.

200.    Electrical transformers and associated equipment, including bushings, insulation materials, wiring, coatings, and gaskets, historically incorporated fluoropolymer materials and other components that may contain PFOS, PFOA, and other PFAS.[14]

201.    On or about August 11, 2017, National Grid's pad-mounted electrical transformer located at 187 Billerica Road experienced a failure of primary bushing, resulting in the release of approximately 140 gallons of mineral oil dielectric fluid into the surrounding environment, including soil and subsurface media.

202.    This release was reported to MassDEP and assigned RTN 3-34427.

203.    Upon information and belief, the transformer and associated electrical equipment owned, operated, and/or controlled by National Grid contained PFOS, PFOA, and other types of PFAS in insulation materials, wire coatings, gaskets, seals, and/or other internal and external components, and releases from such equipment resulted in the discharge, disposal, release, and/or migration of PFOS, PFOA, and other types of PFAS into the soil, groundwater, and environment at and downgradient of 187 Billerica.

---

[14] U.S. Environmental Protection Agency, *PFAS Handling Industry Sectors* (XLSX), ECHO PFAS Tools, https://echo.epa.gov/trends/pfas-tools#identified (last visited Feb. 17, 2026) (identifying industry sectors historically associated with PFAS manufacturing, processing, use, handling, or release).

204.    Upon information and belief, National Grid's acts and omissions caused and/or contributed to the release, disposal, and migration of PFOS, PFOA, and other PFAS, resulting in contamination of groundwater and public drinking water sources relied upon by Plaintiff.

205.    As a direct and proximate result of National Grid's release of hazardous substances, Plaintiff has incurred, and will continue to incur response costs, investigation costs, remediation costs, and other damages.

206.    **Defendant MCP IV, LLC ("MCP IV")** is a limited liability company that is the current owner of the real property located at 187 Billerica Road, Chelmsford, Massachusetts since around October 2025.

207.    MCP IV owns the land and building located at 187 Billerica Road and holds authority and control over the premises, including leasing, maintenance, and property management.

208.    Upon information and belief, PFOS, PFOA, and other PFAS were released at 187 Billerica Road through historical and ongoing industrial, manufacturing, laboratory, and utility operations conducted at the property, including releases through septic systems, industrial wastewater disposal, floor drains, stormwater infrastructure, transformer equipment failures, and other disposal and migration pathways.

209.    Upon information and belief, PFOS, PFOA, and other types of PFAS released at 187 Billerica Road have migrated and continue to migrate through soil, subsurface materials, and groundwater, and have impacted North Chelmsford's drinking water supply wells and drinking water sources.

210.    MCP IV acquired title to the Property after hazardous substances had been released and/or disposed of at the site and has owned the Property during the time hazardous substances have been present in environmental media and have continued to migrate off-site.

211.    As a direct and proximate result of the above, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA, and other types of PFAS contamination.

212.    As current owner of a facility from which hazardous substances were released and continue to be released, MCP IV, LLC is liable under CERCLA §107(a)(1).

### D.    Defendants at 25 Katrina Road, Chelmsford, MA

213.    The property located at 25 Katrina Road, Chelmsford, Massachusetts ("25 Katrina Road") has been used for industrial manufacturing, metal finishing, coating, and surface treatment operations involving the use, handling, storage, and disposal of hazardous substances.

214.    Industrial operators at 25 Katrina Road, including Pace Industries LLC and its finishing division JEL Finishing, and Japenamelac Corp., conducted metal finishing, coating, enameling, painting, and related surface treatment operations involving the use of industrial chemicals, solvents, coatings, plating solutions, and wastewater-generating processes.

215.    Regulatory records maintained by the MassDEP identify 25 Katrina Road as a location where releases of hazardous substances occurred during industrial operations, and MassDEP assigned RTN 3-0002973 to the property in connection with reportable releases of oil and hazardous materials and associated regulatory investigation and oversight.

216.    Environmental investigations and regulatory records confirm that hazardous substances were released at 25 Katrina Road through industrial operations, waste handling practices, and wastewater disposal pathways, creating conditions for contamination of soil, subsurface materials, and groundwater.

217.    During the time Defendants operated the Facility, industrial operations conducted there involved the use and handling of hazardous substances and generated wastes containing hazardous substances, which were released into the environment, including soil and groundwater.

218.    Under MassDEP regulations, public water supply wells are protected through the establishment of Zone I, Zone II, and IWPA, which delineate groundwater recharge and capture areas contributing flow to public drinking water wells. Hazardous substances released within these areas can migrate through groundwater and enter public drinking water supplies, creating a direct hydrological pathway between contaminant releases and public water supply wells.

219.    25 Katrina Road is located within the water protection area, capture zone, and wellhead protection area of public drinking water supply wells owned and operated by North Chelmsford, and groundwater beneath 25 Katrina Road flows toward and contributes to municipal drinking water sources.

220.    **Defendant PACE INDUSTRIES LLC ("Pace")** owned and/or operated an industrial manufacturing facility located at 25 Katrina Road, Chelmsford, Massachusetts.

221.    At all relevant times, Pace conducted manufacturing and industrial processing operations at 25 Katrina Road involving metalworking, machining, surface finishing, coating, and related industrial activities.

222.    JEL Finishing (also referred to as "JEL") is a division, trade name, and/or internal operating unit of Pace Industries LLC, through which Pace conducted surface finishing and coating operations at 25 Katrina Road.

223.    At all relevant times, JEL Finishing operations at 25 Katrina Road were owned, controlled, and operated by Pace Industries LLC as part of its integrated manufacturing and finishing business.

224.    Pace Industries LLC is liable for the acts and omissions of its divisions, business units, and trade names, including JEL Finishing, and for releases of hazardous substances resulting from operations conducted under those names.

225.    During its operations at 25 Katrina Road, Pace, including through JEL Finishing, used, handled, stored, and disposed of industrial chemicals, solvents, oils, metals, plating solutions, and other substances, and generated hazardous wastes.

226.    Metal finishing, surface treatment, and coating operations of the type conducted at 25 Katrina Road historically used fluorinated surfactants and related chemical agents containing PFOS, PFOA, and other types of PFAS to improve wetting, reduce surface tension, enhance coating uniformity, and facilitate industrial processing, as documented by EPA, state regulatory agencies, and peer-reviewed scientific literature.[15]

227.    At the time of Pace Industries LLC's operations, PFAS were not routinely monitored or regulated, and historical environmental investigations did not test for PFOS, PFOA, and other PFAS, despite their use in industrial operations and ability to migrate in groundwater and contaminate drinking water sources.

228.    MassDEP records identify the property located at 25 Katrina Road as a location where reportable releases of oil and hazardous materials occurred during the period in which Pace Industries LLC owned and/or operated the facility, and MassDEP assigned RTN 3-0002973 to the Site under Massachusetts hazardous waste and release tracking programs in connection with such releases.

---

[15] Interstate Technology & Regulatory Council, *PFAS: Per- and Polyfluoroalkyl Substances*, § 2.5 PFAS Uses and Products, https://pfas-1.itrcweb.org/uses-and-products/ (last visited Feb. 17, 2026) (describing widespread industrial use of PFAS in coatings, electrical equipment, metal finishing, and manufacturing applications).

229.    Pace Industries LLC is identified in federal and state regulatory databases as a hazardous waste generator and handler and generated, handled, and disposed of hazardous substances, including spent solvents, metal-bearing wastes, fluorinated solvent mixtures, wastewater treatment sludges, and related industrial wastes.

230.    Upon information and belief, Pace Industries LLC's industrial manufacturing involving metalworking, machining, coating and surface finishing operations at 25 Katrina Road involved the use, handling, and disposal of hazardous substances, including PFOS, PFOA, and other types of PFAS, and such operations resulted in releases of those substances into soil and groundwater.

231.    At all relevant times, Pace Industries LLC owned and/or operated the facility during periods when hazardous substances were disposed of or released in violation of environmental laws and is responsible for contamination originating from its operations.

232.    As a direct and proximate result of Defendant Pace Industries LLC's operations and/or ownership of the facility, PFOS, PFOA, and other types of PFAS released at or from 25 Katrina Road migrated through soil and groundwater and contaminated North Chelmsford's drinking water supply wells.

233.    As a direct and proximate result of Defendant Pace Industries LLC's operations at 25 Katrina Road, Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

234.    **Defendant JAPENAMELAC CORP.** ("Japenamelac")[16], formerly known as Nye's Jap Ename-lac, owned and/or operated industrial coating, enameling, lacquering, and surface finishing operations at 25 Katrina Road, Chelmsford, Massachusetts.

235.    Japenamelac conducted manufacturing activities at 25 Katrina Road involving industrial surface finishing, coating, painting, and chemical pretreatment of metal and plastic components, including powder coating, liquid coating, electrostatic painting, chemical conversion coating, surface preparation, printing, and related mechanical assembly processes. Regulatory records identify Japenamelac as a hazardous waste generator at the property.

236.    Publicly available records show that Japenamelac maintained approximately twenty (20) hazardous-waste containers in storage at the facility, four (4) of which were not properly labeled with accumulation start dates, in violation of hazardous-waste management requirements.

237.    During the time Defendant operated the Facility, industrial operations conducted there involved the use and handling of hazardous substances and generated wastes containing hazardous substances, which were released into the environment, including soil and groundwater.

238.    Industrial coating, enameling, lacquering, and surface finishing operations of the type conducted by Japenamelac historically used fluorinated surfactants, wetting agents, and related process chemicals containing PFOS, PFOA, and other types of PFAS to improve coating uniformity, reduce surface tension, prevent defects, and enhance corrosion resistance, and such uses have been identified by EPA, state regulatory agencies, and peer-reviewed scientific literature as potential sources of PFAS releases to soil and groundwater.[17]

---

[16] Japenamelac Corp. is further referenced in this Complaint in connection with its ownership and/or operation of another facility at issue.

[17] *Id.*

239.    Upon information and belief, Japenamelac's coating, finishing, and related industrial operations at 25 Katrina Road involved the use, handling, storage, and disposal of hazardous substances, including PFOS, PFOA, and other types of PFAS, under conditions that allowed such substances to be released into soil and groundwater.

240.    Upon information and belief, PFOS, PFOA, and other types of PFAS were released at 25 Katrina Road through Japenamelac's industrial operations, and waste disposal operations, including releases through rinse waters, wastewater systems, floor drains, sumps, outdoor storage, stormwater infrastructure, and subsurface disposal and migration pathways, resulting in the discharge of PFOS, PFOA and other types of PFAS into soil and groundwater.

241.    As a direct and proximate result of Defendant's operations and/or ownership of the facility, PFOS, PFOA, and other types of PFAS released at or from 25 Katrina Road migrated through soil and groundwater and contaminated North Chelmsford's drinking water supply wells.

242.    As a direct and proximate result of Defendant Japenamelac's operations at 25 Katrina Road, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

243.    **Defendant STORE MASTER FUNDING III, LLC** is a limited liability company that is the current owner of the real property located at 25 Katrina Road, Chelmsford, Massachusetts.

244.    Store Master Funding III, LLC owns the land and buildings located at 25 Katrina Road since 2013 and holds authority and control over the premises, including leasing, maintenance, and property management.

245.    Upon information and belief, PFOS, PFOA, and other PFAS were released at 25 Katrina Road through historical and ongoing industrial, manufacturing, laboratory, and utility operations conducted at the property, including releases through septic systems, industrial wastewater disposal, floor drains, stormwater infrastructure, transformer equipment failures, and other disposal and migration pathways.

246.    Upon information and belief, PFOS, PFOA, and other types of PFAS released at 25 Katrina Road have migrated and continue to migrate through soil, subsurface materials, and groundwater, and have entered and continue to enter groundwater contributing to aquifers and municipal drinking water supply wells operated by North Chelmsford.

247.    As a direct and proximate result of the above, North Chelmsford has incurred, and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

248.    Store Master Funding III, LLC acquired title to the Property after hazardous substances had been released and/or disposed of at the site and has owned the Property during the time hazardous substances have been present in environmental media and have continued to migrate off-site.

249.    As current owner of a facility from which hazardous substances were released and continue to be released, Store Master Funding III, LLC is liable under CERCLA §107(a)(1).

**E.    Defendants at 11 School St., Chelmsford, MA**

250.    The property located at 11 School Street (the "School Street Property"), Chelmsford, Massachusetts is a 12.1-acre parcel historically developed with an industrial mill building and associated manufacturing infrastructure used for industrial production, processing, coating, and finishing operations involving hazardous substances.

251.    The 11 School Street Property includes a historic mill structure originally constructed in the 1800s for manufacturing operations and later used for commercial and industrial purposes, including manufacturing, industrial finishing, coating, and related industrial processes.

252.    The 11 School Street Property contains industrial infrastructure including subsurface raceways, wastewater pathways, millpond discharge systems, mechanical systems, floor drains, and industrial processing areas that historically conveyed water and industrial materials associated with manufacturing operations.

253.    Environmental investigations at the School Street Property identified releases of hazardous substances, including chlorinated volatile organic compounds (VOCs"), in soil, sediment, and water associated with historical industrial operations, and the Site was assigned RTN 3-0049 by the MassDEP.

254.    The 11 School Street Property is subject to an Activity and Use Limitation ("AUL") recorded on the property deed due to releases of hazardous substances and contamination present beneath the building footprint and surrounding subsurface areas.

255.    The 11 School Street Property is located adjacent to Stony Brook and a historic mill pond, which provided hydraulic conveyance pathways for industrial wastewater and contaminants and contributed to migration of hazardous substances to surrounding environmental media.

256.    Under MassDEP regulations, public water supply wells are protected through the establishment of Zone I, Zone II, and IWPA, which delineate groundwater recharge and capture areas contributing flow to public drinking water wells. Hazardous substances released within these areas can migrate through groundwater and enter public drinking water supplies, creating a direct hydrological pathway between contaminant releases and public water supply wells.

257.    The 11 School Street Property is located within the water protection area, capture zone, and wellhead protection area of public drinking water supply wells owned and operated by North Chelmsford, and groundwater beneath the Site flows toward and contributes to municipal drinking water sources.

258.    **Defendant NYE'S JAPENAMELAC INC. ("Nye's Japenamelac")** owned, operated, and/or conducted industrial coating, enameling, lacquering, finishing, and related industrial manufacturing operations at the School Street Property, Chelmsford, Massachusetts.

259.    At all relevant times, Nye's Japenamelac conducted industrial operations involving the use, handling, storage, treatment, and disposal of industrial chemicals, solvents, coatings, lacquers, degreasers, surface treatment chemicals, and hazardous substances.

260.    Industrial coating, enameling, lacquering, and finishing operations of the type conducted by Nye's Japenamelac historically used fluorinated surfactants, wetting agents, degreasing agents, and related industrial chemicals containing PFOS, PFOA, and other types of PFAS.[18]

261.    Upon information and belief, Nye's Japenamelac used, handled, stored, and disposed of hazardous substances, including PFOS, PFOA, and other types of PFAS, in connection with its industrial coating, enameling, finishing, and manufacturing operations at the Site.

262.    Nye's Japenamelac generated industrial wastewater, process waste, and hazardous wastes containing hazardous substances, which, upon information and belief, included PFOS, PFOA, and other types of PFAS, and disposed of such substances through industrial wastewater systems, subsurface disposal pathways, floor drains, sumps, septic systems, and other disposal and migration pathways.

---

[18] *Id.*

263.    Upon information and belief, PFOS, PFOA, and other types of PFAS released at or from the Site migrated through soil, sediment, and groundwater and entered groundwater contributing to North Chelmsford's municipal drinking water supply wells.

264.    At the time of Nye's Japenamelac's operations, PFAS were not routinely monitored or regulated, and historical environmental investigations did not test for PFOS, PFOA, and other PFAS despite their use in industrial operations and their ability to migrate in groundwater and contaminate drinking water supplies.

265.    At all relevant times, Nye's Japenamelac owned and/or operated the facility during periods when hazardous substances were disposed of or released and is responsible for contamination originating from its industrial operations.

266.    As a direct and proximate result of Defendant Nye's Japenamelac's releases of hazardous substances, Plaintiff has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA, and other types of PFAS contamination.

**F.    Defendants at 22 Alpha Road, Chelmsford, MA**

267.    The property located at 22 Alpha Road, Chelmsford, Massachusetts has been used for laboratory, analytical instrument manufacturing, research, storage, and related industrial operations since at least the 1990s. These operations were conducted by Genomic Solutions, ESA Bioscience; Magellan Biosciences; Dionex Corporation; and Thermo Fisher Scientific Inc., and their predecessors, successors, and affiliated entities.

268.    MassDEP and EPA regulatory records identify 22 Alpha Road as a hazardous waste generating facility, including assignments of EPA Identification Numbers to operators such as Magellan Biosciences, Thermo Orion Inc., and Thermo Fisher Scientific Inc., and hazardous waste manifest activity associated with laboratory and industrial operations conducted at the property.

Public regulatory records further identify Dionex Corporation and Thermo Fisher Scientific Inc. as owners and/or operators associated with hazardous substance handling and waste management at the Site, and the facility is listed in EPA regulatory databases, including EPA Enforcement and Compliance History Online ("ECHO") PFAS Analytic Tools database.

269.    Environmental investigations and regulatory oversight associated with the property, including investigations conducted during and after operations by these Defendants, have confirmed the presence and release of hazardous substances at the Site, including hazardous substances capable of migrating through soil and groundwater.

270.    Under MassDEP regulations, public water supply wells are protected through the establishment of Zone I, Zone II, and IWPA, which delineate groundwater recharge and capture areas contributing flow to public drinking water wells. Hazardous substances released within these areas can migrate through groundwater and enter public drinking water supplies, creating a direct hydrological pathway between contaminant releases and public water supply wells.

271.    The property located at 22 Alpha Road is within the water protection area, capture zone, and Zone II wellhead protection area of public drinking water supply wells owned and operated by North Chelmsford, and groundwater beneath 22 Alpha Road flows toward and contributes to North Chelmsford's municipal drinking water sources.

272.    **Defendant GENOMIC SOLUTIONS, INC.** owned and/or operated a facility located at 22 Alpha Road, Chelmsford, Massachusetts and used the property for commercial and industrial laboratory, research, and instrument-manufacturing purposes. The precise dates of Defendant's operations are presently unknown because such information is within the possession, custody, and control of Defendants and third parties and will be established through discovery.

273.    Defendant Genomic Solutions conducted laboratory, research, and instrument-manufacturing operations at 22 Alpha Road involving the use, handling, and generation of regulated chemical and hazardous wastes.

274.    Laboratory, analytical, and instrument manufacturing operations of the type conducted by Genomic Solutions historically used fluoropolymer materials, fluorinated surfactants, coatings, tubing, seals, and analytical reference standards containing PFOS, PFOA, and other types of PFAS, and such materials are known sources of PFAS releases to soil and groundwater.[19]

275.    Defendant Genomic Solutions owned and/or operated laboratory and analytical instrument operations at the facility located at 22 Alpha Road, Chelmsford, Massachusetts, and was identified in federal and state regulatory records as a hazardous waste generator with an assigned EPA Identification Number and subject to regulation under the Resource Conservation and Recovery Act ("RCRA"), and generated, handled, stored, and arranged for the transport and disposal of hazardous substances, including laboratory chemicals, solvents, reagents, coatings, and related industrial process materials.

276.    At all relevant times, Defendant Genomic Solutions exercised authority and control over operations and waste-management practices at 22 Alpha Road and is responsible for contamination originating from its operations.

277.    Upon information and belief, Genomic Solutions' operations resulted in the release of hazardous substances, including PFOS, PFOA, and other PFAS, into soil and groundwater at and from 22 Alpha Road.

---

[19] *Id.*

278.    Upon information and belief, PFOS, PFOA, and other types of PFAS released at or from 22 Alpha Road migrated through soil and groundwater and entered aquifers that supply North Chelmsford's municipal drinking water wells.

279.    As a direct and proximate result of Defendant Genomic Solutions' operations at 22 Alpha Road, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

280.    **Defendant ESA BIOSCIENCES, INC.** owned and/or operated a facility located at 22 Alpha Road, Chelmsford, Massachusetts, and used the property for commercial and industrial laboratory and research activities. The precise dates of Defendant's operations are presently unknown because such information is within the possession, custody, and control of Defendants and third parties and will be established through discovery.

281.    Laboratory and analytical operations of this type routinely use PFOS, PFOA and other types of PFAS-containing fluoropolymer components and may handle PFOS, PFOA and other types of PFAS standards and PFOS, PFOA and other types of PFAS-containing materials in connection with testing, calibration, and related activities.[20]

282.    Regulatory records identify ESA Biosciences, Inc. as a hazardous waste generator and operator at 22 Alpha Road, with documented hazardous waste shipments.

283.    At all relevant times, Defendant ESA Biosciences, Inc. exercised authority and control over operations and waste-management practices at 22 Alpha Road and is responsible for contamination originating from its operations.

---

[20] *Id.*

284.    At the time ESA Biosciences' operations, PFAS were not routinely monitored or regulated, and historical environmental investigations did not test for PFOS, PFOA, and other PFAS, despite their use in industrial operations and ability to migrate in groundwater and contaminate drinking water sources.

285.    Upon information and belief, ESA Biosciences' operations resulted in releases of hazardous substances, including PFOS, PFOA, and other PFAS, into soil and groundwater.

286.    As a direct and proximate result of ESA Biosciences' operations at this facility, PFOS, PFOA, and other types of PFAS released at or from 22 Alpha Road migrated through soil and groundwater and impacted aquifers and municipal drinking water wells operated by North Chelmsford.

287.    As a direct and proximate result of Defendant ESA Biosciences' operations at 22 Alpha Road, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

288.    At all relevant times, Defendant ESA Biosciences, Inc. exercised authority and control over operations and waste-management practices at 22 Alpha Road and is responsible for contamination originating from its operations.

289.    **Defendant MAGELLAN BIOSCIENCES** owned and/or operated a facility located at 22 Alpha Road, Chelmsford, Massachusetts and used the property for laboratory and analytical instrument-related operations. Public records, historical directories, regulatory files, and/or site investigation materials identify Defendant as a past operator of the Facility, although the exact operational dates are not yet known.

290.     Magellan Biosciences acquired ownership and operational control of facilities and business operations previously owned and operated by predecessor entities and continued substantially the same laboratory, manufacturing, and industrial activities involving hazardous substances.

291.     Regulatory records identify Magellan Biosciences associated with 22 Alpha Road and holding EPA Identification Number MAC300015047, with documented hazardous-waste manifests and shipments, including shipments dated October 7, 2011, and records continuing through at least 2018.

292.     Laboratory and analytical operations of this type routinely use PFAS-containing fluoropolymer components and may handle PFOS, PFOA, and other types of PFAS standards and PFOS, PFOA and other types of PFAS-containing materials in connection with testing, calibration, and related activities.[21]

293.     At all relevant times, Defendant Magellan Biosciences exercised authority and control over operations and waste-management practices at 22 Alpha Road and is responsible for contamination originating from its operations.

294.     At the time Magellan Biosciences' operations, PFAS were not routinely monitored or regulated, and historical environmental investigations did not test for PFOS, PFOA, and other PFAS, despite their use in industrial operations and ability to migrate in groundwater and contaminate drinking water sources.

295.     Upon information and belief, Magellan Biosciences' operations resulted in releases of hazardous substances, including PFOS, PFOA, and other PFAS, into soil and groundwater.

---

[21] *Id.*

296.    As a direct and proximate result of Magellan Biosciences' operations at 22 Alpha Road, PFOS, PFOA, and other types of PFAS released at or from the property migrated through soil and groundwater and entered aquifers that supply North Chelmsford's municipal drinking water wells.

297.    As a direct and proximate result of Defendant Magellan Biosciences, Inc.'s operations at 22 Alpha Road, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

298.    **Defendant THERMO FISHER SCIENTIFIC INC**. owned and/or operated the facility located at 22 Alpha Road, Chelmsford, Massachusetts and used the property for commercial and industrial laboratory and manufacturing operations.

299.    Thermo Fisher Scientific Inc. operated a 60,000-square-foot non-manufacturing facility at 22 Alpha Road in Chelmsford, Massachusetts, at least as early as 2015 through at least 2021.

300.    Thermo Fisher Scientific Inc. acquired Dionex Corporation and assumed ownership and operational control of Dionex's facilities, assets, and business operations, including facilities located in North Chelmsford, Massachusetts.

301.    Hazardous-waste notification forms identify Thermo Fisher Scientific Inc.'s operations at 22 Alpha Road as a Small Quantity Generator ("SQG") generating between approximately 220 and 2,200 pounds of hazardous waste per month.

302.    Regulatory databases assign EPA Identification Number MA5000000778 to Thermo Fisher Scientific Inc.'s operations at 22 Alpha Road, reflecting the generation and off-site shipment of hazardous wastes.

303.    Regulatory records further identify Thermo Fisher Scientific Inc. as maintaining a warehouse/finished-goods/shipping operation with a satellite hazardous-waste storage area located directly across the street at 21 Alpha Road, Chelmsford, Massachusetts.

304.    EPA regulatory databases, including the EPA ECHO system, identify Thermo Fisher Scientific Inc. as an industrial facility in Chelmsford, Massachusetts engaged in plastics, resins, and analytical instrument-related industrial activities and regulated under multiple federal environmental programs.

305.    Thermo Fisher Scientific Inc.'s inclusion in EPA's PFAS Analytic Tools and ECHO databases reflects EPA's identification of the facility as an industrial operation within sectors and regulatory programs associated with the use, handling, storage, discharge, and disposal of PFAS, including PFOS and PFOA, and other types of PFAS-containing materials.

306.    Upon information and belief, PFOS, PFOA, and other PFAS were released at 22 Alpha Road through historical and ongoing industrial, manufacturing, laboratory, and utility operations conducted at the property, including releases through septic systems, industrial wastewater disposal, floor drains, stormwater infrastructure, transformer equipment failures, and other disposal and migration pathways.

307.    At all relevant times, Defendant Thermo Fisher Scientific Inc. exercised authority and control over operations and waste-management practices at 22 Alpha Road and is responsible for contamination originating from its operations.

308.    Upon information and belief, PFOS, PFOA, and other types of PFAS released from Thermo Fisher Scientific Inc.'s operations entered groundwater and migrated toward North Chelmsford's public drinking water supply wells.

309.    As a direct and proximate result of Defendant Thermo Fisher Scientific, Inc.'s operations at 22 Alpha Road, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

310.    **Defendant THERMO ORION INC.** owned and/or operated the facility located at 22 Alpha Road, Chelmsford, Massachusetts, and used the property for laboratory and analytical instrument-manufacturing operations.

311.    During the time Defendant operated the Facility, industrial operations conducted there involved the use and handling of hazardous substances and generated wastes containing hazardous substances, which were released into the environment, including soil and groundwater.

312.    Regulatory records identify Thermo Orion Inc. as a hazardous-waste generator at 22 Alpha Road, with documented waste shipments and electronic manifests from 2012 through 2020.

313.    Laboratory and analytical operations of this type routinely use PFOS, PFOA, and other types of PFAS-containing fluoropolymer components and may handle PFOS, PFOA, and other types of PFAS standards and PFOS, PFOA, and other types of PFAS-containing materials in connection with testing, calibration, and related activities.[22]

314.    Upon information and belief, Thermo Orion Inc.'s operations resulted in releases of PFOS, PFOA, and other PFAS into soil and groundwater.

315.    At all relevant times, Defendant Thermo Orion Inc. exercised authority and control over operations and waste-management practices at 22 Alpha Road and is responsible for contamination originating from its operations.

---

[22] *Id.*

316.    At the time Thermo Orion Inc.'s operations, PFAS were not routinely monitored or regulated, and historical environmental investigations did not test for PFOS, PFOA, and other PFAS, despite their use in industrial operations and ability to migrate in groundwater and contaminate drinking water sources.

317.    As a direct and proximate result of Thermo Orion Inc.'s operations at this facility, PFOS, PFOA, and other PFAS released at or from the Site migrated through soil and groundwater and entered aquifers supplying North Chelmsford's municipal drinking water wells.

318.    As a direct and proximate result of Defendant Thermo Orion, Inc.'s operations at 22 Alpha Road, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

319.    **Defendant ANALOG DEVICES INC.[23]** acquired legal title to the property located at 22 Alpha Road, Chelmsford, Massachusetts, on or about October 2025, and is the current owner of the 22 Alpha Road facility from which hazardous substances were released.

320.    Upon information and belief, hazardous substances, including PFOS, PFOA, and other types of PFAS, were present at the 22 Alpha Road at the time Analog Devices, Inc. acquired ownership and remain present in soil, subsurface materials, and groundwater, where they continue to leach, migrate, and discharge into surrounding soils and groundwater and enter aquifers within North Chelmsford's wellhead protection areas that supply its public drinking water wells.

---

[23] Defendant Analog Devices Inc. is further referenced in this Complaint in connection with its ownership and/or operation of another facility at issue.

321.    As a direct and proximate result of the above, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

322.    Analog Devices, Inc. acquired title to the Property after hazardous substances had been released and/or disposed of at the site and has owned the Property during the time hazardous substances have been present in environmental media and have continued to migrate off-site.

323.    As the current owner of 22 Alpha Road, Analog Devices, Inc. is liable under CERCLA §107(a)(1).

### G.    Defendants at 21 Alpha Road, Chelmsford, MA

324.    The property located at 21 Alpha Road, Chelmsford, Massachusetts, has been used for commercial, industrial, and analytical laboratory operations, including operations conducted by Massachusetts Electric Company d/b/a National Grid, and is currently and formerly owned by 19-21 Alpha Road LLC, CPI 21 Alpha LLC, Alpha Road Equity Partners LLC, StJ Alpha Equity Partners LLC, and StJ 19 Alpha Equity Part LLC. These operations involved the use, handling, storage, and disposal of industrial chemicals, laboratory reagents, solvents, oils, coatings, and related industrial materials, including materials historically associated with PFOS, PFOA, and other types of PFAS.

325.    MassDEP regulatory records identify 21 Alpha Road as a hazardous waste site and reportable release location, including assignments of RTN 3-0027786, 3-0002958, and 3-0027712, associated with releases occurring during periods of industrial and commercial operations at the property, including operations conducted by Massachusetts Electric Company d/b/a National Grid. and Nova Engineering. These releases included hazardous substances discharged to soil and groundwater through industrial operations, equipment, and waste handling systems, and MassDEP issued regulatory response actions, including Immediate Response Actions and Notices to PRPs.

326.    Environmental investigations confirmed the presence and release of hazardous substances at the property, including contamination in soil and groundwater resulting from industrial and laboratory operations conducted at 21 Alpha Road.

327.    Under MassDEP regulations, public water supply wells are protected through the establishment of Zone I, Zone II, and Interim Wellhead Protection Areas ("IWPA"), which delineate groundwater recharge and capture areas contributing flow to public drinking water wells. Hazardous substances released within these areas can migrate through groundwater and enter public drinking water supplies, creating a direct hydrological pathway between contaminant releases and public water supply wells.

328.    The property located at 21 Alpha Road is within the water protection area, capture zone, and Zone II wellhead protection area of public drinking water supply wells owned and operated by North Chelmsford, and groundwater beneath 21 Alpha Road flows toward and contributes to North Chelmsford's municipal drinking water sources.

329.    **Defendant MASSACHUSETTS ELECTRIC COMPANY d/b/a NATIONAL GRID ("National Grid")** is, and at all relevant times was, a corporation authorized to do business in the Commonwealth of Massachusetts, and owned, operated, maintained, and/or controlled electrical transmission and distribution infrastructure, including pad-mounted electrical transformers, throughout North Chelmsford, Massachusetts, including at 21 Alpha Road.

330.    At all relevant times, including at least as of January 2008 and earlier, National Grid owned, operated, maintained, and/or controlled a pad-mounted electrical transformer and associated electrical distribution infrastructure located at the Site at 21 Alpha Road.

331.    On or before January 5, 2008, a release of mineral oil dielectric fluid occurred from National Grid's transformer, resulting in the discharge of oil and hazardous substances into surrounding soil and subsurface media.

332.    This release was reported to MassDEP and assigned RTN 3-0027712 and 3-0027786, and response actions were undertaken pursuant to the Massachusetts Contingency Plan.

333.    Electrical transformers and associated equipment historically incorporated fluorinated materials, coatings, insulation, and gaskets containing PFOS, PFOA, and other PFAS, which may be released during equipment failure, leakage, or disposal.[24]

334.    Upon information and belief, releases from National Grid's transformer resulted in the discharge, disposal, and migration of PFOS, PFOA, and other PFAS into soil and groundwater at and downgradient of 21 Alpha Road.

335.    National Grid conducted and directed response actions at the Site and was identified as the PRP in connection with the release.

336.    As a direct and proximate result of National Grid's release and/or threatened release of hazardous substances, Plaintiff has incurred and will continue to incur response costs, remediation costs, and damages.

337.    **Defendant NOVA ENGINEERING** at all relevant times**,** owned and/or operated a facility located at 21 Alpha Road, Chelmsford, Massachusetts and used the property for commercial and industrial purposes. The precise dates of Defendant's operations are presently unknown because such information is within the possession, custody, and control of Defendants and third parties and will be established through discovery.

---

[24] *Id.*

338.     Defendant Nova Engineering is identified in federal and state regulatory records as an operator at 21 Alpha Road and as a Very Small Quantity Generator ("VSQG") of hazardous waste under the RCRA.

339.     Operations conducted by Nova Engineering at 21 Alpha Road involved the use, handling, storage, and disposal of hazardous substances, including laboratory chemicals, industrial reagents, coatings, solvents, and related industrial materials.

340.     Industrial analytical and engineering operations of this type historically used fluoropolymer materials, fluorinated surfactants, coatings, and analytical reference materials containing PFOS, PFOA, and other types of PFAS.

341.     MassDEP records identify RTN associated with documented hazardous substance releases at the Site and reflect regulatory response actions.

342.     Regulatory records further reflect Immediate Response Actions, Notices of Responsibility, and Notices to PRPs issued in connection with releases at 21 Alpha Road.

343.     Upon information and belief, Nova Engineering's operations resulted in releases of hazardous substances, including PFOS, PFOA, and other types of PFAS, into soil and groundwater at 21 Alpha Road.

344.     At all relevant times, Defendant Nova Engineering exercised authority and control over operations and waste-management practices at 21 Alpha Road and is responsible for contamination originating from its operations.

345.     At all relevant times, 21 Alpha Road was used for commercial and industrial purposes.

346.    As a direct and proximate result of Nova Engineering's operations, PFOS, PFOA, and other types of PFAS released at or from the 21 Alpha Road migrated through soil and groundwater and entered aquifers supplying North Chelmsford's municipal drinking water wells.

347.    As a direct and proximate result of Defendant Nova Engineering's operations at 21 Alpha Road, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

348.    **Defendant 19-21 ALPHA ROAD LLC**, and its predecessors CPI 21 Alpha LLC, Alpha Road Equity Partners LLC, StJ Alpha Equity Partners LLC, and STJ 19 Alpha Equity Part LLC (collectively the "Alpha Defendants"), own the property located at 21 Alpha Road, Chelmsford, Massachusetts, at various times between September 28, 2006, to the present.

349.    Hazardous substances, including PFOS, PFOA, and other PFAS, were present at 21 Alpha Road at the time these Defendants acquired ownership, and remain present in soil, subsurface materials, and groundwater.

350.    Hazardous substances present at 21 Alpha Road continue to leach, migrate, and discharge into surrounding soils and groundwater and enter aquifers within North Chelmsford's water protection areas supplying North Chelmsford's public drinking water wells.

351.    As a direct and proximate result of the above, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

352.    19-21 Alpha Road LLC acquired title to the Property after hazardous substances had been released and/or disposed of at the site and has owned the Property during the time

hazardous substances have been present in environmental media and have continued to migrate off-site.

353.    As current and former owners of a facility from which hazardous substances were released and continue to be released, 19-21 Alpha Road LLC and its predecessor entities are liable under CERCLA §107(a)(1) and §107(a)(2).

## H.    Defendants at 2 Elizabeth Drive, Chelmsford, MA

354.    Based upon available records, 2 Elizabeth Drive, Chelmsford, Massachusetts, has been used for commercial, industrial, electronics, and semiconductor-related operations, including operations conducted by Aspect Communications and Analog Devices, Inc., involving the manufacture, assembly, and handling of electronic components and related industrial materials. These operations involved the use, handling, storage, and disposal of industrial chemicals, solvents, coatings, process aids, and related materials, including fluorinated surfactants and process chemicals historically associated with PFOS, PFOA, and other types of PFAS.

355.    Regulatory records identify 2 Elizabeth Drive as a hazardous waste generating facility regulated under the RCRA, including assignment of EPA Identification Numbers MAC300101870 and MAC300101888, and classification of operations at the property as hazardous waste generators subject to state and federal environmental regulation. EPA regulatory databases, including EPA's PFAS ECHO and PFAS analytic tools, identify Analog Devices, Inc. and related operations at this location as regulated industrial facilities within sectors historically associated with PFAS use, handling, and disposal.

356.    Environmental investigations and regulatory records confirm that hazardous substances were generated, handled, and released at the property during periods of industrial operations, creating pathways for contamination of soil and groundwater.

357. Under MassDEP regulations, public water supply wells are protected through the establishment of Zone I, Zone II, and IWPA, which delineate groundwater recharge and capture areas contributing flow to public drinking water wells. Hazardous substances released within these areas can migrate through groundwater and enter public drinking water supplies, creating a direct hydrological pathway between contaminant releases and public water supply wells.

358. The property located at 2 Elizabeth Drive is within the water protection area, capture zone, and wellhead protection area of public drinking water supply wells owned and operated by North Chelmsford, and groundwater beneath 2 Elizabeth Drive flows toward and contributes to North Chelmsford's municipal drinking water sources.

359. **Defendant ASPECT COMMUNICATIONS** owned and/or operated a facility located at 2 Elizabeth Drive, Chelmsford, Massachusetts and used the property for commercial and industrial purposes.

360. Defendant Aspect Communications operated a facility engaged in communications equipment, electronics-related, and technology operations involving electronic hardware, equipment, components, and associated industrial materials at 2 Elizabeth Drive.

361. These operations involved the use, handling, storage, and disposal of equipment, electronic components, industrial chemicals, solvents, cleaning agents, coatings, and related industrial materials.

362. Electronics-related operations commonly involve PFOS, PFOA and other types of PFAS-containing materials used in electronics manufacturing and assembly, including fluorinated process aids, coatings, and cleaning agents used in industrial processes.

363.    Upon information and belief, Aspect Communications' operations resulted in releases of hazardous substances, including PFOS, PFOA, and other types of PFAS, into soil and groundwater at 2 Elizabeth Drive.

364.    At all relevant times, Defendant Aspect Communications exercised authority and control over operations and waste-management practices at 2 Elizabeth Drive and is responsible for contamination originating from its operations.

365.    As a direct and proximate result of Aspect Communications' operations at 2 Elizabeth Drive, PFOS, PFOA, and other types of PFAS released at or from the property migrated through soil and groundwater and entered aquifers supplying North Chelmsford's municipal drinking water wells.

366.    As a direct and proximate result of Defendant Aspect Communications' operations at 2 Elizabeth Drive, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

367.    **Defendant ANALOG DEVICES Inc.** currently owns and/or operates facilities located at 2 Elizabeth Drive, Chelmsford, Massachusetts and uses the properties for semiconductor and electronics manufacturing operations.

368.    EPA regulatory databases, EPA's PFAS ECHO system, identify Analog Devices Inc. as an active regulated industrial facility subject to federal environmental regulation, including RCRA hazardous waste generator requirements.

369.    Semiconductor manufacturing and electronics fabrication operations of the type conducted by Analog Devices Inc. historically used PFOS, PFOA, and other types of PFAS in

photolithography, etching, cleaning, coatings, surface treatment, and semiconductor fabrication processes.

370.    Regulatory records identify Analog Devices Inc. as the PRP for operations at 2 Elizabeth Drive from approximately February 16, 2016, through October 13, 2022.

371.    During its operations, Analog Devices Inc. was classified as a VSQG handling waste oil and polychlorinated biphenyls ("PCBs") and later as a Small Quantity Generator ("SQG") of hazardous waste under the RCRA.

372.    Regulatory records assign EPA Identification Numbers MAC300101870 and MAC300101888 to facilities at 2 Elizabeth Drive, respectively, reflecting the generation and management of regulated hazardous wastes.

373.    The Semiconductor Industry Association ("SIA") was formed in 1977, and its mission statement is to strengthen U.S. leadership in semiconductor manufacturing, design, and research.

374.    Most notably, the SIA has formed a "Semiconductor PFAS Consortium" (the "Consortium"), serving as an international group of semiconductor industry stakeholders organized under the auspices of the Semiconductor Industry Association (SIA) to collect the technical data needed to formulate an industry approach to per- and policy-fluoroalkyl substances based on science.[25]

375.    In or about 2023, the Consortium published a series of white papers in which it described, in detailing the prevalent use of PFAS in the semiconductor industry.

---

[25] https://www.semiconductors.org/pfas/#:~:text=AND%20SEMICONDUCTOR%20PROCESSING%20%3E-,Technical%20Papers,-These%20publications%20were.

376.    Upon information and belief, Analog Devices Inc. used PFOAs and POFS in its chip manufacturing processes until at least 2010.

377.    In the 2000s, the semiconductor industry replaced long-chain PFAS in its chip making processes for short chain PFAS which were thought at the time to be better for the environment. But recent evidence suggests that these compounds may also be hazardous.[26]

378.    As the public learns more and more on a daily basis, PFAS have been widely used in almost all facets of every industry and daily life, particularly in the semiconductor industry, of which Analog Devices Inc. has been a major participant.[27]

379.    At all relevant times, Defendant Analog Devices Inc. exercised authority and control over operations and waste-management practices at 2 Elizabeth Drive and is responsible for contamination originating from its operations.

380.    At all relevant times, 2 Elizabeth Drive were used for commercial and industrial purposes.

381.    Upon information and belief, PFOS, PFOA, and other types of PFAS-containing materials were released from 2 Elizabeth Drive through ordinary handling and disposal practices, including via floor drains, wastewater systems, and/or stormwater pathways.

382.    Hazardous substances released at 2 Elizabeth Drive remain present in soil and groundwater and continue to leach, migrate, and discharge into surrounding soils and groundwater.

383.    As a direct and proximate result of Analog Devices Inc.'s operations at 2 Elizabeth Drive, PFOS, PFOA, and other types of PFAS migrated through groundwater and entered aquifers supplying North Chelmsford's public drinking water wells.

---

[26] Kim Martineau, Mitigating the Environmental Harm of PFAS 'forever chemicals," IBM Research Blog (Apr. 22, 2024), http://research.ibm.com/blog/mitigating-pfas.

[27] https://trellis.net/article/ibm-achieves-first-full-phase-out-toxic-compounds/.

384.    As a direct and proximate result of Defendant Analog Devices Inc.'s operations at 2 Elizabeth Drive, Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

## I.    Defendants at 515 Groton Road, Westford, MA

385.    The property located at 515 Groton Road, Westford, Massachusetts, has been used for semiconductor and electronics manufacturing operations, including operations conducted by Renesas Electronics America Inc. and related entities. These operations involved the use, handling, storage, and disposal of industrial chemicals, including fluorinated process aids, coatings, surfactants, etching agents, and cleaning materials historically associated with PFOS, PFOA, and other types of PFAS.

386.    Regulatory records identify the facility as a hazardous waste generator subject to regulation under the Resource Conservation and Recovery Act and listed in EPA's PFAS ECHO, reflecting federal regulatory oversight of hazardous substance handling and disposal at the property.

387.    Under MassDEP regulations, public water supply wells are protected through the establishment of Zone I, Zone II, and IWPA, which delineate groundwater recharge and capture areas contributing flow to public drinking water wells. Hazardous substances released within these areas can migrate through groundwater and enter public drinking water supplies, creating a direct hydrological pathway between contaminant releases and public water supply wells. Regulatory records further identify the property as a hazardous waste generating industrial facility subject to environmental notification, compliance, and oversight, including hazardous waste and air quality regulatory programs.

388.    Groton Road is located within a groundwater recharge and flow area hydrologically connected to North Chelmsford's water protection area, and groundwater beneath the property flows toward and contributes to municipal drinking water supply wells operated by North Chelmsford.

389.    **Defendant RENESAS ELECTRONICS AMERICA INC.** owned and/or operated a facility located at 515 Groton Road, Westford, Massachusetts and used the property for commercial and industrial purposes.

390.    Defendant Renesas Electronics America Inc. operated a facility engaged in semiconductor and electronics manufacturing activities at 515 Groton Road during periods not yet fully disclosed.

391.    The 515 Groton Road facility operated by Renesas Electronics America Inc. is identified in regulatory records as an active hazardous waste generator under the RCRA, EPA Identification Number MAR000596940.

392.    Regulatory records identify Renesas Electronics America Inc. as classified as a VSQG of hazardous waste under RCRA.

393.    The facility is identified in EPA's Enforcement and Compliance History Online ("ECHO") system and specifically listed in the PFAS ECHO database.

394.    The Semiconductor Industry Association ("SIA") was formed in 1977, and its mission statement is to strengthen U.S. leadership in semiconductor manufacturing, design, and research.

395.    Most notably, the SIA has formed a "Semiconductor PFAS Consortium" (the "Consortium"), serving as an international group of semiconductor industry stakeholders organized under the auspices of the Semiconductor Industry Association (SIA) to collect the

technical data needed to formulate an industry approach to per- and policy-fluoroalkyl substances based on science.[28]

396.    In or about 2023, the Consortium published a series of white papers in which it described, in detailing the prevalent use of PFAS in the semiconductor industry.

397.    Upon information and belief, Renesas Electronics America Inc. used PFOA and PFOS in its chip manufacturing processes until at least 2010.

398.    In the 2000s, the semiconductor industry replaced long-chain PFAS in its chip making processes for short chain PFAS which were thought at the time to be better for the environment. But recent evidence suggests that these compounds may also be hazardous.[29]

399.    As the public learns more and more on a daily basis, PFAS have been widely used in almost all facets of every industry and daily life, particularly in the semiconductor industry, of which Renesas Electronics America Inc. has been a major participant.[30]

400.    At all relevant times, operations conducted by Renesas Electronics America Inc. involved semiconductor fabrication, electronics manufacturing, equipment cleaning, chemical handling, and associated materials and waste.

401.    Semiconductor and electronics manufacturing operations commonly involve PFAS-containing materials used in fluorinated process aids, surfactants, dielectric coatings, etching agents, and industrial cleaning agents.[31]

---

[28]https://www.semiconductors.org/pfas/#:~:text=AND%20SEMICONDUCTOR%20PROCESSING%20%3E-,Technical%20Papers,-These%20publications%20were.

[29] Kim Martineau, Mitigating the Environmental Harm of PFAS 'forever chemicals," IBM Research Blog (Apr. 22, 2024), http://research.ibm.com/blog/mitigating-pfas.

[30] https://trellis.net/article/ibm-achieves-first-full-phase-out-toxic-compounds/.

[31] *Id.*

402.    Upon information and belief, PFOS, PFOA and other types of PFAS-containing materials were used, handled, stored, and/or disposed of at the 515 Groton Road facility during the course of ordinary semiconductor and electronics manufacturing operations.

403.    Upon information and belief, PFOS, PFOA and other types of PFAS were released from this facility through ordinary handling and disposal practices, including via floor drains, wastewater systems, equipment cleaning operations, and/or stormwater pathways.

404.    At all relevant times, Defendant Renesas Electronics America Inc. exercised authority and control over operations and waste-management practices at 515 Groton Road and is responsible for contamination originating from its operations.

405.    As a direct and proximate result of Defendant Renesas Electronics America Inc. operations at the 515 Groton Road, PFOS, PFOA, and other PFAS migrated through groundwater and entered aquifers supplying North Chelmsford's public drinking water wells.

406.    As a direct and proximate result of Defendant Renesas Electronics America Inc.'s operations at 515 Groton Road, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

**J.    Defendants at 15 Research Place, North Chelmsford, MA**

407.    The site 15 Research Place, North Chelmsford, Massachusetts, has been used for industrial activities including semiconductor design and manufacturing operations conducted by Linear Technology Corp. and, following its acquisition, Analog Devices, Inc. These operations involved the use, handling, storage, and disposal of industrial chemicals, including fluorinated process aids, surfactants, coatings, and cleaning agents historically associated with PFOS, PFOA, and other types of PFAS.

408.     Regulatory records identify the facility as a hazardous waste generator subject to regulation under the Resource Conservation and Recovery Act and listed in EPA's PFAS ECHO, reflecting federal regulatory oversight of hazardous substance handling and disposal at the property.

409.     Under MassDEP regulations, public water supply wells are protected through the establishment of Zone I, Zone II, and IWPA, which delineate groundwater recharge and capture areas contributing flow to public drinking water wells. Hazardous substances released within these areas can migrate through groundwater and enter public drinking water supplies, creating a direct hydrological pathway between contaminant releases and public water supply wells. Regulatory records further identify the property as a hazardous waste generating industrial facility subject to environmental notification, compliance, and oversight, including hazardous waste and air quality regulatory programs.

410.     15 Research Place is located within the water protection area, capture zone, and wellhead protection area of public drinking water supply wells operated by North Chelmsford, and groundwater beneath the property flows toward and contributes to municipal drinking water sources.

411.     **Defendant LINEAR TECHNOLOGY CORP.** owned and/or operated a semiconductor design and manufacturing facility located at 15 Research Place, North Chelmsford, Massachusetts, and utilized the property for commercial and industrial activities involving the manufacturing of semiconductors and electronic materials.

412.     Defendant Linear Technology Corp. operated a facility engaged in electronics and semiconductor-related business activities at 15 Research Place where it conducted commercial and

industrial operations involving the generation, handling, storage, and disposal of regulated substances.

413.    The 15 Research Place facility operated by Linear Technology Corp. is identified in regulatory records as a hazardous waste generator under the RCRA.

414.    Regulatory records identify Linear Technology Corp as classified under Massachusetts hazardous waste regulations as a VSQG.

415.    Regulatory records further reflect electronic manifest ("E-Manifest") activity associated with the 15 Research Place facility, including documented shipments of hazardous waste off-site for treatment and disposal.

416.    Hazardous waste records identify the handling and shipment of regulated hazardous waste, including waste classified under federal waste code D008 (lead).

417.    At all relevant times, operations conducted by Linear Technology Corp. involved electronics manufacturing, semiconductor-related processes, chemical handling, equipment cleaning, and associated materials and waste.

418.    Electronics and semiconductor-related operations commonly involve PFOS, PFOA and other types of PFAS-containing materials used in fluorinated surfactants, dielectric coatings, etching agents, cleaning agents, and industrial process aids.[32]

419.    The Semiconductor Industry Association ("SIA") was formed in 1977, and its mission statement is to strengthen U.S. leadership in semiconductor manufacturing, design, and research.

---

[32] Interstate Technology & Regulatory Council, *PFAS: Per- and Polyfluoroalkyl Substances*, § 2.5 PFAS Uses and Products, https://pfas-1.itrcweb.org/uses-and-products/ (last visited Feb. 17, 2026) (describing widespread industrial use of PFAS in coatings, electrical equipment, metal finishing, and manufacturing applications).

420.    Most notably, the SIA has formed a "Semiconductor PFAS Consortium" (the "Consortium"), serving as an international group of semiconductor industry stakeholders organized under the auspices of the Semiconductor Industry Association (SIA) to collect the technical data needed to formulate an industry approach to per- and policy-fluoroalkyl substances based on science.[33]

421.    In or about 2023, the Consortium published a series of white papers in which it described, in detailing the prevalent use of PFAS in the semiconductor industry.

422.    Upon information and belief, Linear Technology Corp. used PFOA and PFOS in its chip manufacturing processes until at least 2010.

423.    In the 2000s, the semiconductor industry replaced long-chain PFAS in its chip making processes for short chain PFAS which were thought at the time to be better for the environment. But recent evidence suggests that these compounds may also be hazardous.[34]

424.    As the public learns more and more on a daily basis, PFAS have been widely used in almost all facets of every industry and daily life, particularly in the semiconductor industry, of which Linear Technology Corp. has been a major participant.[35]

425.    Upon information and belief, PFOS, PFOA and other types of PFAS-containing materials were used, handled, stored, and/or disposed of at the 15 Research Place facility during the course of ordinary operations conducted by Linear Technology Corp.

---

[33]https://www.semiconductors.org/pfas/#:~:text=AND%20SEMICONDUCTOR%20PROCESSING%20%3E-,Technical%20Papers,-These%20publications%20were.

[34] Kim Martineau, Mitigating the Environmental Harm of PFAS 'forever chemicals," IBM Research Blog (Apr. 22, 2024), http://research.ibm.com/blog/mitigating-pfas.

[35] https://trellis.net/article/ibm-achieves-first-full-phase-out-toxic-compounds/.

426.    At all relevant times, Defendant Linear Technology Corp. exercised authority and control over operations and waste-management practices at 15 Research Place and is responsible for contamination originating from its operations.

427.    Upon information and belief, PFOS, PFOA, and other types of PFAS released at or from 15 Research Place migrated through soil and groundwater and entered aquifers that supply North Chelmsford's municipal drinking water wells.

428.    As a direct and proximate result of Defendant Linear Technology Corp.'s operations at 15 Research Place, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

429.    **Defendant ANALOG DEVICES, INC.** owned and/or operated a facility located at 15 Research Place, North Chelmsford, Massachusetts and used the property for commercial and industrial purposes.

430.    In or about July 2016, Defendant Analog Devices, Inc. acquired Linear Technology's assets, and the transaction closed in or about March 2017.

431.    As a result of that acquisition, Linear Technology Corp. became a wholly owned subsidiary of Analog Devices, Inc., and its operations, assets, and business activities were integrated into Analog Devices' corporate structure.

432.    Defendant Analog Devices, Inc. engages in semiconductor and related device manufacturing activities at the 15 Research Place facility and continues to operate the site for commercial and industrial purposes.

433.    The 15 Research Place facility operated by Analog Devices, Inc. is identified in regulatory records as an active hazardous waste generator under RCRA, EPA Identification Number MAR000564666.

434.    Regulatory records classify Analog Devices, Inc. as a VSQG of hazardous waste.

435.    The facility is identified in EPA's ECHO system and specifically listed within the PFAS ECHO database.

436.    EPA PFAS ECHO records identify the facility as operating within NAICS Code 334413, Semiconductor and Related Device Manufacturing.

437.    Semiconductor manufacturing operations commonly involve the use of fluorinated process aids, surfactants, dielectric coatings, etchants, photoresists, and cleaning agents, including materials historically formulated with or containing PFOS, PFOA and other types of PFAS.[36]

438.    The Semiconductor Industry Association ("SIA") was formed in 1977, and its mission statement is to strengthen U.S. leadership in semiconductor manufacturing, design, and research.

439.    Most notably, the SIA has formed a "Semiconductor PFAS Consortium" (the "Consortium"), serving as an international group of semiconductor industry stakeholders organized under the auspices of the Semiconductor Industry Association (SIA) to collect the technical data needed to formulate an industry approach to per- and policy-fluoroalkyl substances based on science.[37]

---

[36] Interstate Technology & Regulatory Council, *PFAS: Per- and Polyfluoroalkyl Substances*, § 2.5 PFAS Uses and Products, https://pfas-1.itrcweb.org/uses-and-products/ (last visited Feb. 17, 2026) (describing widespread industrial use of PFAS in coatings, electrical equipment, metal finishing, and manufacturing applications).

[37] https://www.semiconductors.org/pfas/#:~:text=AND%20SEMICONDUCTOR%20PROCESSING%20%3E-,Technical%20Papers,-These%20publications%20were.

440.    In or about 2023, the Consortium published a series of white papers in which it described, in detailing the prevalent use of PFAS in the semiconductor industry.

441.    Upon information and belief, Analog Devices Inc. used PFOAs and POFS in its chip manufacturing processes until at least 2010.

442.    In the 2000s, the semiconductor industry replaced long-chain PFAS in its chip making processes for short chain PFAS which were thought at the time to be better for the environment. But recent evidence suggests that these compounds may also be hazardous.[38]

443.    As the public learns more and more on a daily basis, PFAS have been widely used in almost all facets of every industry and daily life, particularly in the semiconductor industry, of which Analog Devices Inc. has been a major participant.[39]

444.    Upon information and belief, PFOS, PFOA and other types of PFAS-containing materials were used, handled, stored, and/or disposed of at the 15 Research Place facility during the course of operations conducted by Analog Devices, Inc.

445.    Upon information and belief, PFOS, PFOA and other types of PFAS were released from the facility through ordinary industrial practices, including wastewater discharge, floor drains, chemical handling activities, equipment cleaning operations, and/or stormwater pathways.

446.    At all relevant times, Defendant Analog Devices, Inc. exercised authority and control over operations and waste-management practices at 15 Research Place and is responsible for contamination originating from its operations.

---

[38] Kim Martineau, Mitigating the Environmental Harm of PFAS 'forever chemicals," IBM Research Blog (Apr. 22, 2024), http://research.ibm.com/blog/mitigating-pfas.

[39] https://trellis.net/article/ibm-achieves-first-full-phase-out-toxic-compounds/.

447.    Upon information and belief, PFOS, PFOA, and other types of PFAS released at or from the 15 Research Place facility migrated through soil and groundwater and contributed to contamination impacting North Chelmsford's municipal water supply sources.

448.    As a direct and proximate result of Defendant Analog Devices, Inc.'s operations at 15 Research Place, North Chelmsford has incurred and will continue to incur response costs associated with investigation, monitoring, treatment, and remediation of PFOS, PFOA and other types of PFAS contamination.

**FIRST CAUSE OF ACTION**
**Cost Recovery Liability Pursuant to 42 U.S.C. § 9607 (CERCLA)**

449. Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

450. To the extent Plaintiff seeks recovery under CERCLA, such claims are limited to response costs incurred as a result of releases of PFOA and PFOS, the hazardous substances designated under CERCLA.

451. Under CERCLA, 42 U.S.C. §§ 9601, *et seq*., owners and operators of facilities are liable for "costs of response incurred by any…person" occasioned by a "release, or a threatened release which causes the incurrence of response costs, of a hazardous substance," and other forms of compensation.  42 U.S.C. § 9607(a).

452. Plaintiff is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

453. Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

454. Each Defendant is, or was, an "owner" and/or "operator" within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

455. Each of Defendants' locations identified above is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

456. CERCLA defines the term "release" broadly and it means, among other things, "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment…." 42 U.S.C. § 9601(22).

457. PFOA and PFOS are each a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602.

458. There have been "releases", and/or continue to be releases, and/or disposal of PFOA and PFOS from each Defendant's facility within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22). Upon information and belief, these releases or threatened releases are ongoing.

459. The hazardous substances released from Defendants' facilities were, and are being, released within the source water protection area for Plaintiff's Water Source and migrated to Plaintiff's Water Source.

460. Plaintiff has incurred and will continue to incur necessary response costs pursuant to CERCLA § 107(a), all of which are, and will be, consistent with the national contingency plan, as a result of the release and/or threatened releases of hazardous substances from Defendants' facilities.

461. Each Defendant is therefore a responsible party pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and liable for necessary response costs as the owner or operator

of a facility from which there was a release of hazardous substances that have contaminated Plaintiff's public drinking water supply.

462. By reason of the foregoing, Defendants are liable, jointly and severally, for Plaintiff's necessary response costs, and damages regarding contamination to Plaintiff's public water supply from PFOA and PFOS.

## SECOND CAUSE OF ACTION
### Declaratory Judgment Pursuant to 42 U.S.C. §§ 9607(a) and 9613(g)(2) (CERCLA)

463. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

464. CERCLA § 113(g)(2) provides in pertinent part: "In any action described in this subsection [, which includes 42 U.S.C. §§ 9607(a),] the court shall enter a declaratory judgment of liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 113 (g)(2).

465. By reason of the foregoing and pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), Plaintiff is entitled to a declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances in Plaintiff's public drinking water supply as referenced herein.

466. A declaratory judgment will prevent the need for multiple lawsuits as Plaintiff continues to incur costs for which Defendants are liable and will provide a resolution of the issue between the parties regarding further liability for future costs.

467. A declaratory judgment will establish Defendants' allocation of costs associated with addressing the contamination of the public water supply, insuring an equitable and efficient response to the problem.

468. Public interest will be served in that a declaratory judgment will ensure a prompt and environmentally proper response to the contamination of Plaintiff's public drinking water supply.

469. Plaintiff will continue to incur additional remedial and response costs, including but not limited to costs to investigate, test, monitor, design, install, operate and maintain treatment systems, and take other measures to address the contamination of its property and its drinking water supply with hazardous substances.

470. Plaintiff's costs are and will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

471. Plaintiff is thus entitled to a declaratory judgment regarding Defendants' liability for response costs and damages that will be binding on subsequent actions to recover further response costs or damages.

## THIRD CAUSE OF ACTION
### Continuing Public Nuisance

472. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

473. Plaintiff, its residents, and businesses have the common law right to clean, safe, potable source of water of their own choosing.

474. The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

475. Plaintiff supplied a clean, safe, portable source of water until it was discovered that PFAS contamination had migrated to Plaintiff's water supply.

476. Defendants by their negligent, reckless, and willful acts have caused the release of PFAS from their facilities that, because their facilities are either within the Plaintiff' delineated " WHPA" or Watershed Zone of Critical Concern, have migrated into Plaintiff' Water Sources.

477. Defendants released PFAS through direct discharge, water emissions, air deposition, spills, runoff, during defendants' respective manufacturing or operations, and as part of industrial wastewater and solid waste.

478. By their actions, Defendants have unreasonably and substantially interfered with and/or endangered (i) the public right to pure drinking water as well as a clean and unpolluted natural environment, including reserves of unpolluted groundwater; (ii) Plaintiff's special status and authority regarding its natural resources; (iii) Plaintiff' ability to protect, conserve, and manage its natural resources; and (iv) the rights of the people of its citizens to enjoy their natural resources from interference by pollution and contamination.

479. Defendants' conduct has injured the property, health, safety and/or comfort of a considerable number of persons.

480. The public nuisance caused by the presence of PFAS in Plaintiff' drinking water supply, both existing concentrations and those still migrating to it, has affected the public at large and has had, and will continue to have, a significant impact.

481. The acts and omissions of Defendants unreasonably and significantly interfered with, and continue today to unreasonably and significantly interfere with, the common rights of Plaintiff, its residents, and business, to a safe source of drinking water of their own choosing, and

have caused and continue today to cause, detrimental effects on the public health, welfare, safety, comfort, and convenience of the residents and businesses, thus creating a public nuisance.

482. Defendants knew or, in the exercise of reasonable care should have known, that the release of PFAS into natural resources and Plaintiff's Water Sources would and has unreasonably and seriously endangered, injured, and interfered with the ordinary comfort, use, and enjoyment of vital groundwater resources relied upon by Plaintiff and the public.

483. As a direct and proximate result of Defendants' conduct, they have created an ongoing public nuisance, and Plaintiff has incurred substantial damages, and will incur additional damages to remove PFAS from the public water supply so Plaintiff can provide its residents and consumer with clean and healthy water.

484. The interference with Plaintiff's ability to deliver uncontaminated drinking water far outweighs any social utility of Defendants' actions.

485. As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## FOURTH CAUSE OF ACTION
### Continuing Trespass

486. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

487. Plaintiff is the owner, operator, and actual possessor of real property and improvements used for collecting drinking water from Plaintiff' Water Sources and delivering drinking water to their residents and users of it.

488. Defendants intentionally engaged in the actions that caused the release of PFAS from their facilities.

489. Upon information and belief, Defendants knew, or should have known, that PFAS contamination migrated through groundwater and surface water contaminating Plaintiff' real property used for collecting, treating, and delivering drinking water and the drinking water itself.

490. Defendants did not and do not have authority, privilege, or permission to trespass upon Plaintiff' property interests.

491. The acts and omissions of Defendants caused the PFAS contamination to migrate, via surface soils and sediments, stormwater runoff, the ground, nearby surface waters and tributaries hydrologically connected to the Concord and Merrimack River Basins., contaminating Plaintiff' real property used for collecting, treating, and distributing drinking water, interfering with its property rights, including Plaintiff' right to the full use and enjoyment of its water system for treatment and distribution to residents and businesses. These acts and omissions created a trespass on Plaintiff' property and unlawful interference with Plaintiff' property rights.

492. As a direct and proximate cause of Defendants' conduct in creating an ongoing trespass against Plaintiff' property, in the form of the ongoing PFOS, PFOA and other types of PFAS contamination of Plaintiff' water system, Plaintiff have incurred substantial damages and will incur additional damages to remove PFAS from the public water supply in order to provide their residents and customers with clean and healthy water.

493. As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined at the time of trial.

### FIFTH CAUSE OF ACTION
**Negligence**

494. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

495. Defendants knew or should have known that PFOS, PFOA and other types of PFAS, PFOS, PFOA and other types of PFAS containing products and materials, and other toxic chemicals, create a substantial risk of harm to surface water and groundwater and to members of the public who consume such surface water and groundwater.

496. Defendants knew or should have known that the chemicals containing PFOS, PFOA and other types of PFAS, and other toxic substances which they were distributing, purchasing, transporting, using, processing, mixing, storing, handling and/or disposing create a substantial risk of harm contaminating the soil, surface waters, groundwater, the aquifers and therefore, Plaintiff's Water Source.

497. Defendants negligently distributed, stored, transported, and/or disposed of, or willfully, wantonly, and intentionally spilled, disposed of, or otherwise permitted the release of PFOS, PFOA and other types of PFAS at and from their facilities and/or properties as to cause severe contamination of surface waters, soil, groundwater, and/or the aquifer, and/or said Defendants own or owned the properties upon which such actions and/or results occurred.

498. Defendants owed Plaintiff a duty to act as reasonable operators and/or owners of property and to take all necessary precautions to prevent the release of PFOS, PFOA and other types of PFAS, and other toxic chemicals into the surface waters, soil and groundwater at their properties.

499. Defendants owed Plaintiff a cognizable duty to exercise reasonable care in the purchasing, transporting, using, processing, mixing, storing, handling and/or disposing of PFOS, PFOA and other types of PFAS and/or in owning property upon which such actions and/or results occurred to take reasonable measures to prevent the release and spread of PFOS, PFOA and other types of PFAS, and other toxic chemicals into the hydrological features and into Plaintiff' Water

Source.

500.  Defendants owed Plaintiff a duty to act as reasonable operators and/or owners of property and to take all necessary steps to prevent the continuing and future release of PFOS, PFOA and other types of PFAS from their facilities and/or properties.

501.  Upon learning of a release of solvents and compounds, including but not limited to PFOS, PFOA and other types of PFAS containing products, PFOS, PFOA and other types of PFAS, and other toxic chemicals, at their facilities and/or properties, Defendants owed Plaintiff a duty to act reasonably to remediate, contain, and eliminate the release before it contaminated Plaintiff's Water Source.

502.  Defendants breached the above duties and failed to prevent the releases of PFOS, PFOA and other types of PFAS containing products at their properties.

503.  Defendants also failed to take reasonable, adequate, and sufficient actions to eliminate, correct, or remedy the releases of PFOS, PFOA and other types of PFAS, and other toxic chemicals after they occurred.

504.  Defendants continue to breach their duties to remediate and prevent ongoing and future releases of PFOS, PFOA and other types of PFAS, and other toxic chemicals from their properties into Plaintiff's Water Source.

505.  As a result of Defendants' breaches of their duties, Plaintiff has expended and will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' contamination for many years into the future.

506.  Defendants' breach of their duties was the direct, sole and proximate cause of Plaintiff's damages.

507.  As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum

to be determined by a jury at the time of trial.

## SIXTH CAUSE OF ACTION:
### Failure To Warn

508.  Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

509.  Defendants breached their duty to notify and warn Plaintiff of the likelihood of release of hazardous substances, including but not limited to PFOS, PFOA, other types of PFAS, and other toxic chemicals, at and in the vicinity of Defendants' facilities, and, consequently, in the capture zone of Plaintiff's Water Source.

510.  Upon learning of the release of hazardous substances, including but not limited to PFAS and/or products containing PFOS, PFOA, other types of PFAS, and other toxic chemicals at their facilities and/or properties, Defendants owed Plaintiff a duty to timely notify and warn Plaintiff of the releases.

511.  Defendants breached that duty by failing to timely notify and warn Plaintiff of the releases of hazardous substances, including but not limited to PFOS, PFOA and other types of PFAS, and other toxic chemicals, on and under their properties and, consequently, into Plaintiff's Water Source.

512.  As a result of Defendants' breaches of their duty to warn Plaintiff, Plaintiff was forestalled from undertaking effective and immediate remedial measures, and Plaintiff has expended and will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

513.  As a direct and proximate result of Defendants' above-described failure to provide warnings, Plaintiff has incurred and will continue to incur the following damages:

a.  Existing contamination of Plaintiff's water supply, which may have been prevented or mitigated if timely warnings were given;

b.  Costs of additional testing and monitoring of the hydrological features and Plaintiff's drinking water well for hazardous substances, including but not limited to PFAS, and other toxic chemicals' contamination;

c.  Costs of investigations, risk assessment and planning mitigation measures to address the contamination by hazardous substances, including but not limited to PFAS, and other toxic chemicals;

d.  Costs of treatment for hazardous substances, including but not limited to PFAS, and other toxic chemicals, including design, installation and operation of remediation systems to remove PFAS to a safe level of non-detect;

e.  Loss of water production capacity;

f.  Diminished consumer confidence in Plaintiff's drinking water;

g.  Potential cost to design and install replacement water sources;

h.  Attorney fees and costs; and

i.  Other compensatory damages.

514. As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the forgoing claims, Plaintiff request that the Court grants the following relief:

1.  Find the Defendants liable, jointly and severally, for necessary response costs as the owners or operators of a facility from which there has been and is a release of hazardous substances including PFOA and PFOS that have contaminated Plaintiff's public drinking water supply, and order Defendants to reimburse the Plaintiff for its past, present, and future costs to investigate, monitor, evaluate, and remediate

the PFOA and PFOS that continues to migrate into Plaintiff' public water supply, including the costs of employing outside consultants and testing labs for these tasks.

2. Issue a declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances, PFOA and PFOS, contamination in North Chelmsford's public drinking water supply.

3. Award Plaintiff monetary damages for the continuing trespass, continuing public nuisance, negligence, and failure to warn caused by the PFAS contamination of the Plaintiff's public water supply.

4. Order Defendants to pay for or agree to reimburse the cost of a treatment system(s) to be installed by Plaintiff to remove PFAS from the public water supply.

5. Award Plaintiff its reasonable attorney fees and legal expenses incurred in evaluating the PFAS contamination and prosecuting these claims.

6. Award Plaintiff such other relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all claims for which a jury trial is available.

Dated: March 4, 2026
      Clinton, Massachusetts

Respectfully Submitted,

*/s/ Harold P. Naughton, Jr.*
Harold P. Naughton, Jr., Esq., Judge (ret.)
**NAPOLI SHKOLNIK PLLC**
PO Box 128
Clinton, MA 01510-0128
Tel. (212) 397-1000
HNaughton@napolilaw.com

James L. Simpson, Esq.
    *(Pro Hac Vice Forthcoming)*
**NAPOLI SHKOLNIK PLLC**
360 Lexington Avenue, Floor 11
New York, NY 10017
Tel. (212) 397-1000
JSimpson@napolilaw.com

Robert Gitelman, Esq.
    *(Pro Hac Vice Forthcoming)*
**NAPOLI SHKOLNIK PLLC**
400 Broadhollow Road, Suite 305
Melville, NY 11747
Tel. (212) 397-1000
RGitelman@napolilaw.com

Paul J. Napoli, Esq.
    *(Pro Hac Vice Forthcoming)*
Veronica N. Vazquez, Esq.
    *(Pro Hac Vice Forthcoming)*
Marisa C. Font-Robert, Esq.
    *(Admission Application Forthcoming)*
**NS PR LAW SERVICES LLC**
1302 Avenida Ponce de León
San Juan PR 00907-3982
Tel. (833) 271-4502
PNapoli@nsprlaw.com
VVazquez@nsprlaw.com
MFont@nsprlaw.com

***Counsel for Plaintiff***