UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 26-cv-11113-RGS

NORTH CHELMSFORD WATER DISTRICT, MASSACHUSETTS
v.

ELECTROMETALS, INC., *et al.*

# MEMORANDUM AND ORDER ON MOTIONS TO DISMISS

November 25, 2026

STEARNS, D.J.

North Chelmsford Water District, Massachusetts (District) brought this environmental recovery action under provisions of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 *et seq.*, together with state law claims for public nuisance, trespass, negligence, and failure to warn. Defendants Pace Industries LLC, Japenamelac Corp., and Nye's Japenamelac Corp. (together, School Street Defendants); Analog Devices, Inc. and Analog Devices LLC (successor by conversion and mergers to Linear Technology Corp., together, Research Place Defendants); and Renesas Electronics America, Inc. (Groton Road Defendant) move to dismiss under Fed. R. Civ. P. 12(b)(6). For the following reasons, the motions are GRANTED in part and DENIED in part.

## BACKGROUND

The court, for purposes of deciding the pending motions, accepts as true the well-pleaded factual allegations in the Complaint and draws all reasonable inferences in the favor of the District as the nonmoving party.

The District owns and operates a drinking water system supplying potable water to approximately 7,500 residential, commercial, and industrial customers in and around North Chelmsford, Massachusetts. The District draws its water from the Merrimack River Basin aquifer system through six groundwater wells which are served by a single treatment plant. Periodic testing required by the Commonwealth of Massachusetts and the federal Environmental Protection Agency (EPA), disclosed elevated levels of synthetic per- and polyfluoroalkyl substances (PFAS) in the District's groundwater wells – including perfluorooctane sulfonic acid (PFOS) and perfluorooctanoic acid (PFOA) – all above the permitted federal maximum contaminant level (MCL).

PFAS are manufactured chemical compounds known as "forever chemicals" because of their environmental lifetimes and enduring effects. PFAS contain strong carbon-fluorine bonds that bioaccumulate and adversely impact human health and the environment. PFAS are also water soluble, meaning that once released into the environment they spread

efficiently with the potential to infiltrate drinking water used in surrounding homes and businesses. EPA is directed to monitor PFAS by the Safe Drinking Water Act and over time has determined that PFOS and PFOA are likely carcinogenic even in the smallest of concentrations. Studies have also associated PFOS and PFOA with, among other things, increased risk of high blood pressure, ulcerative colitis, pregnancy complications, and high cholesterol.

Effective July 9, 2024, EPA designated PFOA and PFOS as "hazardous substances" under CERCLA, 42 U.S.C. § 9601. The designation came with the warning that these particular chemicals "may present a substantial danger to the public health or welfare or the environment when released." Compl. ¶ 49. EPA also established a list of entities posing a high risk of PFAS contamination and deploys PFAS Analytics Tools to track manufacture, release, and occurrence of the chemicals. EPA's Source Water Assessment Program (SWAP) also requires states to identify contaminated areas that potentially contribute water to the public drinking water supply. These areas are referred to as source water protection areas or zones of concern.[1] When

[1] The terms "wellhead protection area" and "wellhead protection zone" are also used interchangeably. Compl. ¶¶ 53, 56. The Massachusetts Department of Environmental Protection (MassDEP) regulations further delineate the source water protection area of public water supply wells as

a manufacturing facility is located inside the source water protection area of a water supply well field, hazardous substances released from the facility may infiltrate or leach into the underlying aquifer and migrate toward the supply wells on the path of the groundwater flow, a geological phenomenon known as advection. Pumping from the wells creates or enhances hydraulic gradients that draw groundwater – and contaminants carried by it – towards the same wells.

The District alleges that each of the Defendants' properties is located within its public water zones of capture, has been singled out by EPA as a high-risk PFAS source that has conducted industrial operations involving the use, handling, storage, treatment, and/or disposal of industrial chemicals containing PFOS, PFOA, and other types of PFAS, and has permitted these substances to migrate into the District's wells and water supply. The District's specific allegations regarding each of the Defendants' properties track a similar narrative, as follows.

<u>School Street Defendants</u>

This property is located at 11 School Street in Chelmsford (School Street Property). The property consists of a 12.1-acre parcel with an

---

falling within Zone I, Zone II, and Interim Wellhead Protection Areas (IWPA).

industrial mill building and associated manufacturing infrastructure used for industrial production involving hazardous substances. The School Street Property is located within the District's water protection area, capture zone, and wellhead protection area. Groundwater beneath the School Street Property flows toward and contributes to the District's drinking water supply. The School Street Defendants are engaged in industrial coating, enameling, lacquering, and finishing operations. The School Street Defendants allegedly used solvents that contained PFOA and PFOS and generated hazardous industrial wastewater containing PFOA and PFOS. The wastewater was allegedly disposed via floor drains, sumps, and septic systems eventually finding its way to the District's wells. The School Street Defendants have a documented history of environmental violations occurring at the Property, including (a) MassDEP determination that hazardous substances, including chlorinated volatile organic compounds (VOCs), had been released into the surrounding soil; and (b) the placing of the Property under an Activity and Use Limitation (AUL) because of releases of hazardous substances.

<u>Research Place Defendants</u>

This property is located at 15 Research Place in Westford (Research Place Property). It is located within a groundwater recharge and flow area

that is hydraulically connected to the District's water protection area. Groundwater flows underneath the Property towards the District's wells. The Research Place Defendants used the Property to manufacture semiconductors and electronics. The manufacturing process involved the handling, storage, and disposal of industrial chemicals such as fluorinated process aids, surfactants, coatings, and cleaning agents commonly associated with PFOS and PFOA. Prior to 2010, Research Place Defendants allegedly used PFOA and PFOS solvents that were released through wastewater discharge, into the soil and groundwater surrounding the District's water supply. The Research Place Defendants have a history of environmental violations at the Property, including: (a) designation by EPA as a Very Small Quantity Generator (VSQG) for generating hazardous waste; and (b) being listed in EPA's PFAS ECHO suspected sources database.

Groton Road Defendant

The factual assertions laid out regarding the Research Place Property and Research Place Defendants are for all practical purposes identical to those alleged against the property located at 515 Groton Road in Westford (Groton Road Property) and the Groton Road Defendant.

After identifying PFAS contamination in its drinking water supply, the District installed a granular activated carbon (GAC) filtration system in 2021.

The District claims that it has incurred and will continue to incur investigation, monitoring, planning, design and installation, treatment, operating and maintenance costs because of Defendants' contributions to the PFAS contamination.

The District initiated this action on March 4, 2026. The Complaint was originally brought against nearly thirty defendants. The defendants collectively filed a joint motion to dismiss (Dkt # 136-137, Joint Motion), and several individual defendants, including the School Street Defendants and the Research Place Defendants, separately filed supplemental motions to dismiss (Dkt # 139-141, 143-144, 146-164, 172, collectively with Joint Motion, Motions to Dismiss). The Groton Road Defendant subsequently joined in the Joint Motion. Dkt # 172.

On August 12, 2026, the court endorsed a stipulation of partial dismissal with prejudice discharging claims against certain properties and defendants. Dkt # 176. On September 9, 2026, the remaining parties filed a joint status report specifying the surviving parties, properties, and claims and confirming the accuracy of the docket.[2] Dkt # 182. The Joint Motion

[2] Only one error was noted regarding the docket – a failure to reflect that MCP IV 187 Billerica Owner LLC was dismissed pursuant to the court's August 12 Order. *See* Dkt # 183 (corrected).

(and the related supplemental motions) remain pending as to the School Street Defendants, Research Place Defendants, and Groton Road Defendant.

## LEGAL STANDARD

When considering a Rule 12(b)(6) motion to dismiss, the court determines whether the facts alleged "plausibly narrate a claim for relief." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) citing *Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). A complaint must include facts sufficient to "raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This determination requires a two-step inquiry. *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013). First, the court distinguishes between factual and conclusory legal allegations in the complaint. *Id.* Then, the court must determine if the factual allegations are sufficient to support "the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citations omitted). "[N]o single allegation need [establish] . . . some necessary element [of a cause of action], provided that, in sum, the allegations of the complaint make the claim as a whole at least plausible." *Garayalde-Rijos v. Municipality of Carolina*, 747 F.3d 15, 24 (1st Cir. 2014) (citations omitted). "In determining whether a [pleading] crosses

the plausibility threshold, the reviewing court [must] draw on its judicial experience and common sense. . . . This context-specific inquiry does not demand a high degree of factual specificity." *García-Catalán*, 734 F.3d at 103 (citations omitted).

## DISCUSSION

### I. CERCLA (Counts I and II)

The District seeks cost recovery under 42 U.S.C. § 9607(a) (Count I); and declaratory judgment under 42 U.S.C. §§ 9607(a) and 9613(g)(2) (Count II). CERCLA "was enacted to address the growing problem of toxic wastes. It is a broad response and reimbursement statute," which "imposes strict liability on responsible parties."[3] *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1150 (1st Cir. 1989) (Dedham I) (citations omitted). To establish liability in a private-party CERCLA lawsuit:

> 1. The defendant must fall within one of four categories of covered persons. 42 U.S.C. § 9607(a).
>
> 2. There must have been a "release or threatened release" of a hazardous substance from defendant's facility. 42 U.S.C. § 9607(a)(4); 42 U.S.C. § 9601(14), (22).
>
> 3. The release or threatened release must "cause[ ] the incurrence of response costs" by the plaintiff. 42 U.S.C. § 9607(a)(4).

[3] Affirmative defenses are available, but none are asserted here. *See Acushnet Co. v. Mohasco Corp.,* 191 F.3d 69, 74 (1st Cir. 1999).

> 4. The plaintiff's costs must be "necessary costs of response . . . consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B); 42 U.S.C. § 9601(23)-(25).

*Dedham I*, 889 F.2d at 1150.

<u>Causation</u>

Defendants argue that the Complaint does not plausibly allege a release or threatened release of PFOA or PFOS from the individual Defendants' properties, or that there is a plausible allegation of a causal connection between the releases alleged and the District's response costs. "To satisfy the causal element, it is usually enough to show that a defendant was a responsible party within the meaning of 9607(a); that clean up efforts were undertaken because of the presence of one or more hazardous substances identified in CERCLA; and that reasonable costs were expended during the operation." *Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 77 (1st Cir. 1999); *see also Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 456-457 (1st Cir. 1992) (Dedham II) (even in the absence of "actual contamination," a defendant may be liable if "polluting substances that stopped short of the well field's boundary could conceivably have caused the [plaintiff] to incur expenses compensable under CERCLA.").

According to the Complaint, PFOA and PFOS, chemicals identified as PFAS and categorized by EPA as "hazardous substance[s]," have been detected in its drinking water supply at elevated levels; Defendants'

properties are located within the District's source water protection area; Defendants used, released, stored, handled and/or disposed of PFAS and PFAS-containing materials in a negligent manner that caused PFOA and PFOS to migrate into the District's drinking water; and the District has incurred damages because of the contamination, including the costs of installation of a GAC filtration system as well as the costs of investigation and maintenance. These allegations, read as a whole and taken as true, are sufficient to give Defendants fair notice of the claims asserted and the grounds on which they rest, and plausibly allege that Defendants were each "a responsible party within the meaning of 9607(a); that clean up efforts were undertaken because of the presence of one or more hazardous substances identified in CERCLA; and that reasonable costs were expended during the operation." *Acushnet Co.*, 191 F.3d at 77.

Defendants' arguments to the contrary are not insubstantial but are ultimately unconvincing. First, Defendants ask the court to replace the Complaint's allegations regarding the location and migration pathways associated with the Defendants' properties with a reconfiguration laid out in a map appended to their briefing.[4] *See* Joint Mot. at 4. Defendants claim

[4] The map originates from the Massachusetts Bureau of Geographic Information (MassGIS) but was altered by Defendants to: (1) "remove[] any Zone IIs outside of the North Chelmsford Water District, along with the

that the map shows, contrary to the allegations in the Complaint, that the School Street, Research Place, and Groton Road Properties are not located within the District's wellhead protection area.[5] The District does not dispute the authenticity of the map but does dispute that it means "that groundwater beneath any parcel fails to reach the district's wells." Opp'n at 13. The court may take judicial notice of the existence of the map as a publicly available government record but will not consider it in the context of a motion to

---

public water supply wells outside the Zone II #5676 boundary lines," *id.*; and (2) add a legend that purportedly indicates where the District's public water supply wells and certain of Defendants' properties are located vis-à-vis the Zone II boundary lines.

[5] The map shows "North Chelmsford Water district, Zone II #567," which Defendants claim constitutes the entire wellhead protection area because Zone II encompasses Zone I and IWPA. On its face, Defendants' assertion that the properties fall outside the zone seems to be mostly inaccurate. The map does not identify the School Street Property or Groton Road Property; it mostly addresses the properties that the parties have already agreed to dismiss.

dismiss for the truth of its contents,[6] particularly given that the parties dispute its relevance to the allegations in the Complaint.[7]

Second, Defendants characterize the District's allegations as generic "industry-wide" assertions and "historical associations" regarding Defendants' types of business and product lines and conclusory statements about one-time industrial practices involving the use, handling, and release of hazardous substances. However, at the pleading stage, the District's allegations are sufficient to raise a plausible inference that Defendants used and released, or threatened release, of PFOS and PFOA, and that there are migration pathways from each property to the District's wells that could explain the contamination of the District's drinking water. *See, e.g., Village of Nyack v. Prof'l Disposables, Inc.*, 2026 WL 2676899, at *7 (S.D.N.Y. Sept.

---

[6] *See Torrens v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468, 473 (1st Cir. 2005) (judicially noticed government records are "relevant not for the truth of anything asserted in it but simply as a legally significant event, like a treaty or a will."); *Pietrantoni v. Corcept Therapeutics Inc.*, 640 F. Supp. 3d 197, 205 (D. Mass. 2022) (granting request for judicial notice of government records publicly available on the FDA website "for the fact that they exist, the information they comprise, and their legal effect, but not the truth of their contents.").

[7] *See Piercy v. AT&T Inc.*, 2025 WL 2505660, at *38 (D. Mass. Aug. 29, 2025), *report and recommendation adopted*, 2025 WL 2809008 (D. Mass. Sept. 30, 2025) ("Defendants' invitation to compare Plaintiffs' allegations with materials that can be found in public records[] would entangle the Court in a[] protracted factual inquiry based upon a record of uncertain dimensions.").

11, 2026) (allegations that PFAS were released, or at the very least were threatened to be released, at facilities within plaintiff's source water protection area "are more than sufficient to demonstrate a plausible inference" that defendants used those substances in violation of CERCLA) (citation omitted). The District is "not required to plead specific evidence or extra facts beyond what is needed to make the claim plausible." *See id.* (collecting cases holding similarly).

Finally, Defendants challenge the allegations made "upon information and belief," such as the claim that PFOS and PFOA were in fact released at each property. These allegations are permissible at the motion to dismiss stage; the facts pled are "likely to be within [Defendants'] control" and cannot reasonably be expected to be known by the District "without the benefit of discovery." *García-Catalán*, 734 F.3d at 104.

<u>Statute of Limitations</u>

Defendants next argue that Counts I and II are barred by the applicable statute of limitations. CERCLA delineates "removal" and "remedial" actions, each with a different limitations period triggered by different events. Determining which type of action applies is a question of law. *United States v. Raytheon co.*, 334 F. Supp. 3d 519, 526 (D. Mass. 2018). In brief, "removal actions" are focused on "'cleanup and removal' to remove hazardous

substances where a release already has occurred or is threatened to occur immediately," whereas "remedial actions" are focused on "preventing migration of substances that could cause substantial damage in the more distant future." *United States v. Bos. & Me. Corp.*, 2016 WL 5339573, at *11 (D. Mass. Sept. 22, 2016) (citation omitted). Of particular relevance to this motion, a suit to recover costs for a removal action must be brought "within 3 years after *completion* of the removal action." 42 U.S.C. 9613(g)(2)(A) (emphasis added).[8]

Here, Defendants argue that the 2021 installation of a GAC filtration system is a *completed* removal action, meaning the three-year limitations period expired in 2024. The District does not dispute the characterization of its suit as a removal action but argues that the Complaint alleges a removal "continuing in nature" – as opposed to one that is completed – because of ongoing monitoring, sampling, and testing of the existing PFAS contamination.[9] Having concluded that the District's response constitutes a

[8] While an action to recover costs for a remedial action must be brought "within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph." 42 U.S.C. 9613(g)(2)(B).

[9] The District alternatively argues that to the extent its actions function as a remedial action, that limitations window also has not closed.

removal action, the court is satisfied for present purposes that the Complaint plausibly alleges that the removal is not "complete," leaving open the possibility of a different result after the factual record is fully developed. *See, e.g.*, *NL Indus., Inc. v. ACF Indus.*, 2014 WL 1316166, at *4 (W.D.N.Y. Mar. 31, 2014) (denying dismissal where even if the parties agreed that the work constituted a removal action, its completion under § 9613(g)(2)(A) was not clear on the pleadings alone).

Double Recovery

Defendants contend that the District impermissibly seeks double recovery because the District has already entered multiple settlements in a Multi-District Litigation (MDL) involving PFAS contamination of its wells.[10] *See* Joint Mot. at 8-10, 20-21 citing Exs. B-E (Dkt # 137-2–5). The District in turn argues that (a) there is simply nothing from which the court can take judicial notice that would allow the court to definitively conclude that the Complaint seeks double recovery; (b) Defendants' theory essentially requires plaintiffs to plead an extra non-reimbursed-costs element; and (c) courts

[10] CERCLA provides that "[a]ny person who receives compensation for removal costs or damages or claims pursuant to any other Federal or State law shall be precluded from receiving compensation for the same removal costs or damages or claims as provided in this chapter." 42 U.S.C. § 9614(b).

typically address double recovery on a developed record and if necessary, apply past recovery as a credit against a judgment.

The District's argument for present purposes has heft. While the court has no reason to disregard the fact of a prior litigation with results favorable to the District, the court has nothing before it regarding the terms of the prior settlements, such as any amounts, categories of costs, or allocations among the hundreds of water systems on the MDL stipulation schedules. Whether any dollar the District received compensates any costs it seeks to recover in this action is fair game for a future hunt. *Cf. United States v. Davis*, 31 F. Supp. 2d 45, 68-69 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001) (considering settlement agreement terms and the risk of double recovery under § 9614(b) in equitably allocating CERCLA liability following a bench trial).

## II. State Law Tort Claims

Defendants also move to dismiss the state law claims for continuing public nuisance (Count III), continuing trespass (Count IV), negligence (Count V), and failure to warn (Count VI).[11]

---

[11] The parties' September 9, 2026 joint status report confirms that the District is not pursuing its failure to warn claim (Count VI) and the District's opposition does not revisit it. The court therefore treats the claim as abandoned and any argument opposing its dismissal as waived.

Causation

Defendants posit that "[t]he pleading defects applicable to Plaintiff's CERCLA claim on the element of causation are equally applicable, and therefore fatal, to Plaintiff's common law theories of recovery." Joint Mot. at 18. For the reasons previously stated above, the court rejects this argument. *Cf. Higgins v. Huhtamaki, Inc.*, 2022 WL 2274876, at *4-8 (D. Me. June 23, 2022) (denying a motion to dismiss common law tort claims making similar causation arguments as here).

Statute of Limitations

Defendants next argue that each of the common-law claims is time barred because tort actions must be brought within three years of the accrual of the cause of action. *See* Mass. Gen. Laws ch. 260, § 2A.

Defendants assert that the 2021 GAC filtration system installation aborts any purported *continuing* nuisance and trespass claims. Under Massachusetts law, "a continuing trespass or nuisance must be based on recurring tortious or unlawful conduct and is not established by the continuation of harm caused by previous but terminated tortious or unlawful conduct." *Taygeta Corp. v. Varian Assocs., Inc.*, 436 Mass. 217, 231 (2002) quoting *Carpenter v. Texaco, Inc.*, 419 Mass. 581, 583 (1995). In *Taygeta*, plaintiff's allegation that groundwater contamination migrating from the

defendant's property "continues to flow unabated," even though the defendant's practice of dumping hazardous material on its property had ceased decades earlier, adequately stated a claim for continuing nuisance. 436 Mass. at 232. Such is the case here. That the Complaint alleges that a GAC filtration system was installed to remove PFAS contamination is not incompatible with the allegations that releases from each facility continue to occur or that PFOS and PFOA remain in the groundwater at these facilities and continue to migrate.[12]

Second, Defendants argue that, because of the "discovery rule," each tort claim accrued by 2021,[13] when the District completed its GAC filtration

---

[12] *City of Bos. v. OptumRx, Inc.*, 169 F.4th 58 (1st Cir. 2026) is distinguishable. There, plaintiffs alleged that pharmacy benefit managers created a continuing public nuisance by colluding with opioid manufacturers to misrepresent risks of opioid drugs. *Id.* at 60. The complaint failed to state a continuing nuisance claim because it did not allege any ongoing or specific recent act that could constitute recurring actionable misconduct and instead based the claim on a single allegation related to the defendants' recent remedial measures. *Id.*

[13] Defendants also cite public records to argue that these facts were known or reasonably knowable in 2020. *See* Ex. A. Exhibit A consists of excerpted pages of the Town of Chelmsford's "Phase I Initial Site Investigation and Tier Classification Report" (2020 ISI Report) submitted to MassDEP. Defendants ask the court to take judicial notice of the filings "as evidence of the timing of Plaintiff's knowledge of PFAS contamination in its water supply." Joint Mot. at 8 n.7. Given what can be inferred from the Complaint alone as to what was known or reasonably knowable in 2021 or 2022, the court need not decide whether to take judicial notice of the 2020 ISI Report.

system in response to PFAS contamination. Given that the Complaint pleads continuing nuisance and trespass, the court need only consider this argument as it pertains to the negligence claim.[14] The discovery rule "tolls the statute of limitations until a plaintiff knows, or reasonably should have known, that it has been harmed or may have been harmed by the defendant's conduct." *Taygeta Corp.*, 436 Mass. at 229. "Reasonable notice that a particular product or a particular act of another person may have been a cause of harm to a plaintiff creates a duty of inquiry and starts the running of the statute of limitations." *Bowen v. Eli Lilly & Co.*, 408 Mass. 204, 210 (1990).

Defendants argue that because the Complaint identifies Defendants based on their industries and geographic locations the District knew or should have known the factual basis for its negligence claim by 2021. The court agrees. As the District itself explains, "if those facts [regarding Defendants' industries and geographic location] sufficed to start the limitations clock, they suffice to state a claim now. Defendants cannot rate the identical facts adequate for accrual and inadequate for pleading." Opp'n at 30. This cuts both ways. The District fails to explain why the facts alleged

[14] Massachusetts does not recognize a theory of continuing negligence. *See Church v. Gen. Elec. Co.*, 138 F. Supp. 2d 169, 174-175 (D. Mass. 2001).

in its Complaint could not have been investigated and collected sooner. Its only argument, which the court does not credit, is that its 2023 MDL complaint "reserved claims against others who handled 'PFOS, PFOA, and/or their chemical precursors,'" and pled that the District conducted a "reasonable search and investigation." Opp'n at 23 citing Ex. B ¶¶ 109-110. Even if Defendants' identities were not reasonably knowable until the publication of EPA's PFAS Analytics Tools metadata in July of 2022 – data that the District in part relied on to identify Defendants as PFAS users, *see* Compl. ¶¶ 50 n.7, 95 – the limitations period would have expired in July of 2025, months before the Complaint was filed in March of 2026. Thus, the negligence claim is time barred.

**ORDER**

For the foregoing reasons, the Motions to Dismiss are ALLOWED as to Counts V and VI and DENIED as to Counts I-IV. The District's motion for leave to file a sur-reply is DENIED as moot.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE